HALLMARK AND JOHNSON PROPERTIES, LTD., Plaintiff-Appellant, v. ANTONIO A. GADEA, Defendant-Appellee.

First District (4th Division)   No. 1—90—1293

Opinion filed August 29, 1991.

922

Barry E. Morgen and Sheldon G. Perl, both of Chicago, for appellant.

Vincent A. Lavieri, of Kovitz, Shifrin & Waitzman, of Arlington Heights, for appellee.

JUSTICE McMORROW delivered the opinion of the court:

Plaintiff, Hallmark & Johnson Properties, Ltd., brought an action against defendant, Antonio A. Gadea, for payment of a $40,000 real estate broker's commission. On appeal, plaintiff contends that the trial court erred in granting summary judgment for defendant.

On March 30, 1988, plaintiff, a real estate broker, and defendant entered into a cooperative listing agreement for the sale of a 44-unit apartment building owned by defendant. The agreement as subsequently amended provided that $875,000 would be the sales price of the building and that plaintiff would be paid a commission of $40,000. Defendant also agreed

"[t]o accept a Purchase Money Note and Trust Deed, or execute Installment Agreement for Warranty Deed, or accept a Junior Purchase Money Note and Trust Deed in the amount of $100,000-$150,000 ***."

Defendant further agreed to pay the $40,000 broker's commission

"in the event Broker produces a Purchaser ready, willing and able to purchase the premises on the terms herein provided *** at the time of execution and delivery of deed or installment agreement for deed, whichever occurs sooner, and Broker is authorized to deduct the commission and expenses from the earnest money deposit at such time."

On or about August 31, 1988, defendant signed a real estate sales contract to sell the property to Lyle T. and Debra L. Berkson and their daughter, Frances Rotman (the Berksons), for $865,000, with an initial payment of $30,000 in earnest money, to be increased to 10% of the purchase price within 15 days of acceptance of the contract. Defendant subsequently agreed to accept the $30,000 as the total amount of earnest money. The earnest money was to be held in escrow by plaintiff.

Paragraph 3 of the contract, entitled "Mortgage Contingency," provided:

"This contract is contingent upon Purchaser securing within 60 days of acceptance hereof a commitment for a fixed rate mortgage, or an adjustable mortgage *** for $648,750.00, the interest rate *** not to exceed 10.88% per annum, amortized over 25 years, payable monthly, ***. If Purchaser does not obtain such commitment, Purchaser shall notify seller in writing within said number of days. If Seller is not so notified, it shall be conclusively presumed that Purchaser has secured such commitment or will purchase said property without mortgage financing. If Seller is so notified, Seller or broker may, within an equal number of additional days, secure a mortgage commitment for Purchaser upon the same terms, and said commitment may be given by Seller as well as a third party. Purchaser shall furnish all requested credit information and sign customary papers relating to the application and securing of such commitment. If Purchaser notifies Seller as above provided, and neither Purchaser, Seller nor Broker secures such commitment as above provided, this contract shall be null and void and all earnest money shall be returned to Purchaser and Seller shall not be liable for any sales commission."

Because defendant did not have legal counsel when he signed the real estate contract, plaintiff's agent, Richard Dawidiuk, recommended to defendant that he employ attorney L. Sanford Blustin to represent him. According to Blustin's deposition, defendant told Blustin that defendant wanted the fullest possible protection of the second

mortgage he agreed to hold. Blustin therefore prepared a rider to the contract which stated in paragraphs 1 and 2 that defendant would hold a second mortgage of $151,250 at 9.5%, and that the actual down payment would be $65,000. Paragraph 3 of the rider provided:

> "It is agreed by the parties hereto, that this property which is presently in a land trust with the Ravenswood Bank, will be transferred to the buyers, at the closing of this deal; however, at the same time and simultaneously, the buyers will issue an assignment of their beneficial interest to the seller as security for the said aforementioned second mortgage."

The rider was signed by the parties on August 31, 1988. Between September 6 and September 27, Blustin and the Berksons' attorney, George Skuros, exchanged correspondence regarding the contract and various modifications to it, none of which related to the issue of financing.

On October 19, Donald Hannon, a mortgage broker hired by the Berksons, sent the Berksons a letter and a loan commitment from Citicorp Savings of Illinois for $650,000. The commitment stated that the Berksons' loan application had been approved "subject to the terms and conditions herein." Among those terms and conditions was a paragraph which stated:

> "No secondary financing and no transfer of title or of the beneficial interest in Land Trust will be allowed. Any violation will be a default under the loan."

The commitment also provided that the borrowers, the Berksons, assign their beneficial interest in the property to Citicorp. Finally, the commitment stated:

> "Lender may terminate this commitment if, except as may be otherwise provided herein, (a) the facts presented to Lender relating to the loan have been or are misrepresented to the Borrower."

In his letter accompanying the loan commitment, Hannon advised the Berksons that "[w]hile the commitment requests an Assignment of the Beneficial Interest, the bank will not take it as collateral. A letter from you stating that you accept this commitment 'subject to the bank not taking an Assignment of the Beneficial Interest' will be accepted by the bank." Copies of the loan commitment and Hannon's letter were telefaxed to plaintiff on October 19, 1988. Sometime later, Hannon verbally assured Blustin that he would see to it that Citicorp did not ask for the assignment of the beneficial interest.

In early November, Blustin spoke to Hannon and Skuros regarding the provision in the Citicorp loan commitment prohibiting a sec-

ond mortgage. Blustin was concerned that Citicorp would refuse to make the loan, or would later "call it in" if it learned of the second mortgage defendant agreed to hold. Blustin advised Hannon that defendant wanted his mortgage to be recorded simultaneously with the Citicorp mortgage. Hannon told Blustin that the usual procedure was to record the second mortgage two or three weeks later; and Skuros informed Blustin that the Berksons did not want Citicorp to learn of the second mortgage because it was prohibited under the terms of the loan commitment. Defendant's accountant opined that defendant's interests would not be adequately protected if there was a two- or three-week delay in recording the second mortgage. On November 16, 1988, Blustin advised Dawidiuk and Skuros by telephone that defendant insisted that Citicorp be made aware that there would be a second mortgage on the property and that the first and second mortgages be recorded simultaneously. On November 17, Blustin sent a letter to Skuros restating defendant's position with respect to informing Citicorp of his mortgage and the simultaneous recording of both mortgages.

On November 29, Skuros sent a letter to defendant regarding defendant's "additional demands." Skuros proposed that the second mortgage temporarily be placed on the Berksons' personal residence, and that 10 business days after the closing, the mortgage be transferred to the subject property. According to Skuros:

"This will allow you full protection under the contract and will bypass the need to notify the lender of our additional mortgage. This protection will be in addition to the assignment of the beneficial interest over to you."

Skuros contended that this was "an adequate solution to eliminate any fears you may have," and stated that defendant's failure to cooperate with the proposal would result in Skuros declaring a breach of the contract. A copy of Skuros' letter was sent to Laura Knapp, another of plaintiff's agents.

On December 6, 1988, Blustin met with defendant, Hannon, Skuros, Dawidiuk and Knapp to discuss defendant's concerns regarding the transaction. Hannon stated that he did not believe that Citicorp would learn of the second mortgage, but if it found out and raised any objection he, Hannon, guaranteed that he would secure a first mortgage elsewhere. Blustin advised defendant that the assignment of the beneficial interest to him would adequately safeguard his rights and recommended he agree to the Berksons' proposals. Defendant responded that he wanted to think about the matter for a few days.

On December 14, 1988, Blustin sent a letter to Skuros in which he restated that defendant was willing to consummate the transaction and to hold a second mortgage as long as that mortgage was recorded immediately after closing. Blustin also advised Skuros that if the Berksons did not agree to proceed with the closing by December 19, defendant would declare that they were in default of the contract and that it was null and void. Skuros responded that because of defendant's failure to abide by the terms of the contract, the Berksons had authorized him to file suit for breach of contract and specific performance unless the sale was completed by December 18. The parties were unable to reach agreement on the issues relating to the second mortgage. On December 21, 1988, defendant and the Berksons executed an agreement in which they declared the contract null and void, waived all rights to enforcement of it and agreed to the return of the $30,000 earnest money being held in escrow by plaintiff.

OPINION

■ The general rule governing a broker's right to receive a commission is well settled. If a broker who is employed to sell property by the owner produces a purchaser, within the time limit of his authority, who is ready, willing and able to purchase the property on the terms prescribed by the seller, he is entitled to a commission even if the seller refuses to perform the contract. In such case, however, the broker must prove that the purchaser he produced was ready, willing and able to purchase the property on the terms proposed. *Fox v. Ryan* (1909), 240 Ill. 391, 88 N.E. 974; *Solomon v. Baron* (1984), 123 Ill. App. 3d 255, 462 N.E.2d 756; *Telander v. Posejpal* (1981), 94 Ill. App. 3d 616, 418 N.E.2d 444.

■ A prospective purchaser is deemed ready, willing and able to purchase if he has agreed to buy the property and has sufficient funds on hand or is able to obtain the necessary funds within the time set by the contract. (*Nelson v. Bolton* (1979), 72 Ill. App. 3d 519, 391 N.E.2d 182.) If a transaction is dependent upon the obtaining of a loan or other contingency, a broker's entitlement to his commission is dependent upon the stipulated contingency; and if the broker acquiesces in such an arrangement and the parties are unable to perform the condition after reasonable and *bona fide* efforts to do so, the broker is not entitled to a commission. *Gordon v. Bauer* (1988), 177 Ill. App. 3d 1073, 532 N.E.2d 855; *Telander v. Posejpal* (1981), 94 Ill. App. 3d 616, 418 N.E.2d 444.

Plaintiff does not dispute these well-settled principles. Plaintiff asserts, however, that it is also the rule in Illinois that where a seller

accepts a purchaser procured by the broker within the term of the brokerage agreement, and enters into an enforceable contract with the purchaser, the purchaser's readiness, willingness and ability to purchase are no longer open to question and the broker's right to compensation accrues irrespective of whether the sale is completed. *United Investors, Inc. v. Tsotsos* (1985), 132 Ill. App. 3d 175, 477 N.E.2d 40; *Cabry v. Ionidas* (1970), 122 Ill. App. 2d 167, 258 N.E.2d 45.

Plaintiff contends that in this case the contingencies in the contract were either met by the Berksons or they were waived by defendant, and that the contract was therefore enforceable. Specifically, plaintiff maintains that "it is undisputed" that the Berksons did not notify defendant of their inability to obtain a loan commitment within the 60 days required by the contract; and that because defendant did not declare the contract void at that time, it became an enforceable contract which entitled plaintiff to its commission. Plaintiff argues that merely because defendant agreed to cancel the contract instead of attempting to compel the purchasers to perform it does not deprive plaintiff of its commission. We disagree.

It was known to all parties involved in this transaction prior to the execution of the real estate contract that the Berksons could not purchase the property without financing approximately $800,000, and that they could not obtain a primary mortgage that large. For that reason, defendant agreed to hold a mortgage of approximately $150,000. The Berksons agreed to secure primary financing in the amount of $648,750 and to issue to defendant at closing an assignment of their beneficial interest in the property as security for the second mortgage.

On October 18, 1988, Citicorp issued a loan commitment for the needed amount. However, the commitment was subject to the restrictions that there was to be no secondary financing and no transfer of the beneficial interest in the land trust in which the property was held. The commitment further provided that the Berksons were required to assign the beneficial interest in the land trust to Citicorp.

Except for the amount of the loan, it was clear on its face that the commitment did not otherwise conform to the financing terms set forth in the contract. The commitment expressly prohibited the terms upon which the purchase of the property was conditioned, *i.e.*, the holding of a junior mortgage secured by the assignment of the beneficial interest in the land trust. Without secondary financing, the Berksons were financially unable to purchase the property; but by contracting for secondary financing, they were not eligible, under the

terms of the Citicorp commitment, for the primary mortgage necessary for the purchase.

Indeed, as the trial court observed, the commitment not only was noncompliant with the real estate contract but was actually adverse to defendant's rights and interests thereunder. Notwithstanding any differing representations by the mortgage broker, Hannon, the Citicorp commitment required the Berksons to assign their beneficial interest in the land trust to Citicorp. Such an assignment to Citicorp would have eliminated the security for the second mortgage held by defendant. The commitment also expressly recited that any violation of the restrictions regarding secondary financing and assignment of the beneficial interest in the property would be a default on the loan agreement, which would allow Citicorp to cancel the commitment if it became aware of the default prior to closing or demand full repayment of the primary mortgage after closing. Either situation would be adverse to defendant's interests as the seller and second mortgage holder.

The commitment was also subject to termination if the facts presented to Citicorp relating to the loan were misrepresented. Not only does the issuance of the loan commitment itself indicate that the Berksons misrepresented facts regarding the second mortgage and agreement to assign the beneficial interest in the land trust to defendant, but the November 29 letter from the Berksons' attorney to defendant proposing modifications to the contract concerning the second mortgage expressly stated that the modifications would "bypass the need to notify the lender of our additional mortgage."

Plaintiff, who was then defendant's agent, received a copy of the loan commitment on October 19, 1988, and delivered a copy of it to defendant's attorney within a few days thereafter. The terms of the commitment itself served as notice to all parties involved in this transaction that the purchasers, who did not have sufficient funds of their own, also did not have the ability to legitimately obtain the financing necessary to complete the transaction. Consequently, they were not ready, willing and able purchasers.

■ Waiver of the ready, willing and able conditions will be found only where there is affirmative evidence in the record that the seller personally investigated the financial ability of the prospective buyer and, after due investigation, satisfied himself of that ability. (*Telander v. Posejpal* (1981), 94 Ill. App. 3d 616, 418 N.E.2d 444; *Nelson v. Bolton* (1979), 72 Ill. App. 3d 519, 391 N.E.2d 182.) There is no affirmative evidence in the record that defendant personally investigated the Berksons' financial ability to purchase and satisfied himself of that

ability, without which there would be no waiver of the conditions of readiness, willingness and ability to purchase.

To the contrary, all parties to this transaction were aware of the Berksons' financial inability to purchase the property without secondary financing. Defendant was therefore adamant from the date the contract was signed that the second mortgage he agreed to hold be fully protected. Although the contract did not specifically state when the second mortgage was to be recorded, it did require the Berksons to issue an assignment of their beneficial interest in the property at closing. In light of defendant's express insistence on protection of his mortgage, the only reasonable interpretation of this language is that his mortgage and the assignment of the beneficial interest which secured it were to be recorded together with the primary mortgage in the process of the closing. The dispute regarding this matter arose only after issuance of the loan commitment prohibiting secondary financing and the proposal by the Berksons that recording of the second mortgage be delayed two or three weeks. Defendant, however, never deviated from his original position that his mortgage be fully protected by recordation of it immediately after closing.

■■ In summary, consummation of the transaction in this case was expressly contingent upon the purchasers securing financing which conformed to the terms of the contract. The prospective purchasers produced by plaintiff were never able to purchase the property on the terms contained in the contract, and there is no evidence that defendant waived that condition by personally investigating and satisfying himself of their ability to do so. The facts that defendant did not declare the contract void immediately upon expiration of 60 days and that negotiations continued for a brief time thereafter do not entitle plaintiff to its commission.

For the reasons stated, the order of the trial court granting summary judgment for defendant is affirmed.

Affirmed.

JIGANTI, P.J., and LINN, J., concur.