BENNETT AND KAHNWEILER, INC., Plaintiff-Appellant, v. AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, as Trustee, *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—91—3260

Opinion filed August 28, 1992.—Modified on denial of rehearing October 23, 1992.

Warren Lupel and Barry A. Erlich, both of Katz, Randall & Weinberg, of Chicago, for appellant.

Frederic S. Lane and Jonathan B. Piper, both of Sonnenschein, Nath & Rosenthal, of Chicago, for appellees.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The plaintiff, Bennett & Kahnweiler, Inc., brought this action against the defendants, seeking a judgment for a commission allegedly earned pursuant to a contract for the lease of commercial property owned by the defendants. Following a bench trial, the judge entered judgment in favor of the defendants based upon his finding that because the lease agreement had not been fully executed, the plaintiff was not entitled to the commission provided for in the contract. The judge also found that the judgment in favor of the defendants was supported by the fact that the plaintiff's damages were mitigated by the collection of a commission under a subsequent lease transaction on behalf of its client. The plaintiff has appealed, contending that the court erred in entering judgment in favor of the defendants and in making its determination as to the mitigation of the plaintiff's damages.

In December 1985, the law firm of Schwartz Cooper Kolb & Gaynor, Chartered (Schwartz Cooper), retained the plaintiff, Bennett & Kahnweiler, Inc., as its broker to obtain office space for the law firm in a building in Chicago.

The defendants were trustees of two land trusts which held legal title to an office building located at 33 West Monroe Street in Chicago. The beneficiary of these two land trusts (the property owner) was 33 West Monroe Associates, an Illinois limited partnership. The general partners of 33 West Monroe Associates were Draper & Kramer, Inc. (Draper & Kramer), Douglas Kramer, and Fred Ford. Douglas Kramer was president of Draper & Kramer, and Fred Ford was a senior vice-president. Draper & Kramer had between 8 and 10 corporate divisions and was in the real estate and mortgage banking business. In addition to serving as general partner of the property's owner, Draper & Kramer served as property manager and leasing agent for the building.

In the fall of 1986, Draper & Kramer and the defendant began negotiating a lease for office space on the 22nd floor of the building at 33 West Monroe. Jerry K. Bloomstrand, a senior vice-president of Draper & Kramer, conducted the lease negotiations on behalf of the property owner. Richard Berger and Barbara Ellis acted on behalf of the plaintiff and as agents for Schwartz Cooper.

In a letter to Ellis dated September 22, 1986, Bloomstrand outlined the essential lease terms that were acceptable to the property owner. These terms included rental amount, lease term, area, rental adjustments, lease assumption, construction costs, rent abatement, expansion options, and assignment and subletting. This letter also stated that "[t]he enclosed counter-proposal has been reviewed and approved by ownership as evidenced by Mr. Collopy's signature. These terms represent the final offer, which upon acceptance by your client, will be sent to counsel for the preparation of a lease." The letter bore the signature of Eamonn Collopy and indicated that the document was "approved for ownership" by him. Although this letter included a signature line for Schwartz Cooper, the firm did not sign the document.

By letter dated October 6, 1986, Bloomstrand restated the basic terms which were acceptable to the property owner. In this letter, Bloomstrand agreed to an increase in the lease assumption cap, a change in the split of profits on any sublet, and made reference to a more recent tax bill with regard to rent adjustments. Thereafter, Draper & Kramer employed Patrick Moran, of Sonnenschein Carlin Nath & Rosenthal, as counsel. Moran was assisted by Valerie B. Jarrett, an associate at the Sonnenschein firm. Schwartz Cooper retained Neil T. Neumark of Greenberger Krause & Jacobs to act as counsel on its behalf.

In October 1986, Moran sent a first draft of the lease to Neumark, and several subsequent drafts were exchanged from October 1986 to February 1987. Several meetings and telephone conferences were conducted during the course of the lease negotiations.

On November 20, 1986, Bloomstrand sent a draft commission agreement to the plaintiff. On November 24, 1986, Bloomstrand sent Berger a revised broker's agreement. This revised broker's agreement provided that the defendants would pay the plaintiff a brokerage commission "if a mutually satisfactory lease [was] negotiated and fully executed." This agreement was signed by Berger on December 5, 1986.

Several lease drafts were negotiated and exchanged in the latter part of January 1987. On February 4, 1987, the plaintiff received an unsolicited proposal from another company regarding a lease of space to Schwartz Cooper in another building. The plaintiff performed an economic analysis of this proposal and sent it to Schwartz Cooper on February 9, 1987. Upon review of the economic analysis prepared by the plaintiff, Schwartz Cooper rejected the alternate proposal.

In February 1987, the final draft of the lease was prepared. This draft included a paragraph (Provision 27F) which provided as follows:

> "Submission of this Lease for examination shall not bind the Landlord in any manner, and no Lease or obligation of Landlord shall arise until this instrument is signed by both Landlord and Tenant and delivery is made to each."

On February 23, 1987, counsel for the property owner sent four "execution copies" of the final lease draft to Neumark for execution by Schwartz Cooper. The cover letter which was sent with these documents requested that all four copies of the lease be signed and returned to Bloomstrand. In accordance with this request, Schwartz Cooper signed and returned all four copies of the lease agreement to Bloomstrand.

In late February 1987, an existing tenant in the building expressed interest in expanding into the office space on the 22nd floor. In a letter dated March 2, 1987, Draper & Kramer informed the plaintiff that another firm was competing for this office space. After considering the proposal made by the existing tenant, Douglas Kramer decided to lease the space to that firm rather than to Schwartz Cooper.

In a letter dated March 10, 1987, Moran advised Neumark that the property owner had decided not to rent the subject property to Schwartz Cooper and, accordingly, would not sign the lease that had been negotiated and previously executed by Schwartz Cooper.

On April 9, 1987, the plaintiff sent an invoice to Draper & Kramer in the amount of $184,793.92 for the brokerage commission under the lease agreement that had been negotiated for Schwartz Cooper. The plaintiff filed its complaint against the defendants on June 1, 1987. In November 1987, the plaintiff negotiated a lease for Schwartz Cooper at 20 South Clark Street in Chicago. Pursuant to that transaction, the plaintiff received a commission in the amount of $183,974.19.

On August 5, 1987, the defendants filed a motion to dismiss the complaint under section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—615). The trial court granted the defendants' motion and permitted the plaintiff leave to amend its complaint. On March 23, 1988, the plaintiff filed an amended complaint, and the defendants again filed a motion to dismiss under section 2—615, asserting that the amended complaint failed to state a cause of action because the defendants never signed the lease and because the commission agreement required that the lease be fully executed. The trial judge denied this motion, stating that the only issue in the case was whether or not the plaintiff had procured a ready, willing, and able tenant.

The defendants' answer to the amended complaint denied that the plaintiff was entitled to a brokerage commission for the lease negotiated between the property owner and Schwartz Cooper. The answer asserted as affirmative defenses that (1) the defendants never executed the lease, and (2) the plaintiff had mitigated its damages by collecting a commission for acting as broker for Schwartz Cooper in a subsequent lease transaction. After discovery had been concluded, both parties moved for summary judgment. The trial court denied the cross-motions for summary judgment, and trial commenced on September 3, 1991.

At trial, the plaintiff called Richard Berger, who testified that he was one of the owners of the plaintiff corporation. Berger stated that in 1986 Schwartz Cooper retained the plaintiff as its broker to locate approximately 20,000 square feet of office space in Chicago. The plaintiff defined the goals and objectives of Schwartz Cooper and determined different types of buildings that might suit the needs of the firm.

Berger testified that the property owner initially offered Schwartz Cooper a lease for approximately 19,000 square feet on the 22nd floor of the building at 33 West Monroe for a term of 15 years and at a rental of $27.75 per square foot of gross rentable area, plus rental adjustments and assumption of Schwartz Cooper's existing lease. Berger stated that Schwartz Cooper ultimately signed a lease for about 19,000 square feet on the 22nd floor of that building for a term of 15 years at the same rental cost of $27.75 per square foot of gross rentable area. Berger testified that the provisions for rental adjustments, construction costs, rent abatement, expansion options and assignment and subletting in both the offering letters and in the executed lease were the same. Both the offering letters and the lease provided for the defendants to assume Schwartz Cooper's existing lease. The initial letter of September 22, 1986, included a cap of $750,000 on this liability. In the letter of October 6, 1986, Bloomstrand raised the cap to $780,000. Berger explained that the final lease agreement contained no cap on the liability for Schwartz Cooper's existing lease because the actual liability was less than the proposed cap.

Berger testified further that the plaintiff assisted in the consummation of the lease negotiations. The negotiations terminated with the submission of four execution copies of the lease for Schwartz Cooper's signature. Berger stated that Schwartz Cooper signed the execution copies of the lease agreement and forwarded them to Bloomstrand for signature by the property owner. Berger did not, however, receive copies of the lease with the property owner's signature. After several weeks, Berger called Bloomstrand to follow up on the transaction. At that time, Bloomstrand advised Berger that the property owner did not intend to complete the lease transaction that had been negotiated. Berger then told Bloomstrand that he would call his client because Schwartz Cooper had planned to move into the building after they executed the lease document. Berger testified that Neumark then contacted Moran and that Neumark subsequently received a letter from Draper & Kramer stating that the property owner would not sign the lease.

The plaintiff's next witness was Schwartz Cooper's attorney, Neumark. Neumark, an experienced commercial real estate attorney, testified that he received the lease proposal covering only the basic economic terms of the lease and that it was customary for some of the terms contained in the proposal letter to be clarified or modified later. Neumark recalled Moran telling him during the lease negotiations that he checked with the property owner about certain

proposals which were made to him. Neumark testified that he believed that Bloomstrand represented the owner. Neumark recognized that he could not bind Schwartz Cooper.

Neumark stated further that he discussed changes or proposed changes of the lease with Moran. Although Neumark negotiated the legal terminology in the lease with Moran, they did not negotiate the economic terms of the transaction. Neumark stated that he believed the final draft of the lease document accurately reflected the agreement of the parties.

Neumark testified that along with a letter dated February 23, 1987, he received from Jarrett four execution copies of the lease and four execution copies of an assignment and assumption agreement with instructions to have all four execution copies of both documents signed and returned to Bloomstrand. Neumark testified that the words "four execution copies of the lease" have a customary meaning in lease negotiations and that these documents were ready for signature by the parties. Neumark explained that the assignment and assumption agreement was the agreement whereby the tenant assigned its interest in its prior lease to the landlord. Neumark testified that, contrary to previous correspondence, the letter of February 23, 1987, contained no qualifying language and did not indicate that it was subject to the property owner's approval.

Neumark stated that after he reviewed the final draft of the lease, he sent the copies to Schwartz Cooper and that Schwartz Cooper then signed the documents. Neumark stated that although he had previously received five or six drafts of the lease, this was the only time that he received four copies for execution. Neumark believed that when he received the four execution copies, all of the lease provisions had been agreed upon by the principals, and there were no other terms left to negotiate.

Neumark testified that he did not recall any further communication with Moran after Schwartz Cooper executed the lease documents, and he was not aware of any further contact between Schwartz Cooper and the property owner. Neumark stated further that he did not recall anyone ever telling him that there was some unacceptable item or term in the lease which precluded the property owner from signing the lease. On cross-examination, Neumark acknowledged that it was customary that a commission would not be paid to a tenant's broker unless the lease was fully executed. He was not aware of "any circumstances under which a broker receives a commission where a lease isn't signed by a landlord."

The plaintiff's third witness was Patrick Moran, the attorney for the property owner. Moran stated that the limited partnership that owned the subject building was controlled by its general partners for purposes of leasing transactions. Moran stated that Draper & Kramer acted as the managing agent and as the leasing agent for the building and that it was one of the three general partners. During Moran's representation of the property's owner, his principal contact was Bloomstrand.

Moran testified that he consulted with Bloomstrand before or after making a change in a lease draft, depending upon the importance of the matter and the substance of the change. As the negotiations with Schwartz Cooper progressed and the issues became more definite, he simultaneously sent copies of the lease drafts to Neumark and to Bloomstrand in order to keep the process moving. He did not send out any drafts which included new business or financial terms without having consulted with either Bloomstrand or another person at Draper & Kramer.

Moran began the lease-drafting process with a printed form lease. He then inserted the relevant terms that had been provided to him and sent a draft to Neumark for review. Telephone conferences and meetings were conducted to aid the conclusion of the lease negotiations and to enable the principals to agree on the language of the proposed lease. During the drafting process, Moran checked with Bloomstrand to clarify certain provisions in the proposed lease. Where there were questions on more significant issues, Bloomstrand said that he would get back to Moran with an answer after checking with someone else.

Moran was sure that he spoke with Bloomstrand before he sent the execution copies out and that Bloomstrand knew that the execution copies had been sent to Neumark. Moran testified that he did not learn that his client was discussing the same space with another possible tenant until about a week after he sent the execution copies to Neumark.

Finally, the plaintiff called Jerry Bloomstrand. He stated that he was responsible for marketing space at the subject building. Bloomstrand acknowledged that he marketed the building as being owner-occupied, and the only entity that occupied the building and had an ownership interest in it was Draper & Kramer. Bloomstrand also stated that he inserted Draper & Kramer in various documents prepared by him when he was actually referring to the owner of the building.

Bloomstrand stated that the lease negotiations ended and he did not recall any further communication after the execution copies were prepared and issued. Bloomstrand testified that he was not aware of any terms in the lease signed by Schwartz Cooper that were unsatisfactory to the property owner.

Douglas Kramer, president of Draper & Kramer, testified for the defendants. Kramer described the practice for leasing space in the building owned by the defendants. According to Kramer, leases for space at the subject building were signed by the land trustee as landlord. Leases were executed by the land trustee at the direction of one of three people at Draper & Kramer: Douglas Kramer, Fred Ford, or Ferd Kramer. Kramer stated that he was always aware of any negotiations for space in the subject building.

Kramer testified that a broker in the corporate services division negotiated lease terms with a potential tenant. After the lease was negotiated and executed by the tenant, if it was satisfactory in all respects, then Douglas Kramer signed off on it and authorized the land trustee to sign the lease. If Douglas Kramer was unavailable, then Fred Ford or Ferd Kramer could sign the letter of direction to the land trustee. The property owner insisted that the potential tenant sign the lease before the owner reviewed the document so that the owner knew that the terms were acceptable to the tenant.

According to Kramer, after the potential tenant signed the lease, the document was reviewed by Eamonn Collopy, the head of the corporate services division. Collopy performed an analysis of the lease terms, and if he approved the lease, he would recommend it to Kramer. If Kramer found the lease satisfactory, he would then instruct the land trustees to sign the lease as owner of the property. Kramer was the only person with the authority to accept or reject lease terms. The Draper & Kramer broker who was involved in lease negotiations had no such authority. The brokers for Draper & Kramer were instructed to treat Draper & Kramer and Douglas Kramer as "clients" when negotiating leases for the building.

Kramer testified that the lease signed by Schwartz Cooper was never presented to him for his signature. Kramer acknowledged, however, that he was periodically advised of the progress of the negotiations with Schwartz Cooper. He knew that Bloomstrand was negotiating basic economic terms, and he reviewed all of the economic terms as they were discussed. He participated in the discussions of the business terms for every lease transaction at the building. He never compared the economic terms of the initial term

sheet and the provisions in the lease signed by Schwartz Cooper to see if they were the same.

He personally decided to lease the subject space to an existing tenant in the building. The grounds for this decision included the fact that the property owner had a prior relationship with that tenant, the terms of this lease were economically more favorable, and this tenant had a mor   favorable credit rating.

At the close of the evidence, the trial court entered judgment in favor of the defendants. In making his ruling, the trial judge stated that the plaintiff could have no greater rights than Schwartz Cooper, and nothing in the evidence indicated that the defendants were obligated to sign the lease.

The plaintiff contends that, as a matter of law, it was entitled to collect a commission based upon the lease agreement which had been negotiated between the property owner and Schwartz Cooper even though the agreement was not signed by the defendant. We disagree.

■ The rights and obligations of a real estate broker are determined by the terms of the brokerage contract or listing agreement. (See generally *Tom Brinkoetter & Co. v. Cresthaven Country Club, Inc.* (1983), 118 Ill. App. 3d 554, 454 N.E.2d 1182; *Busch v. Eisin* (1981), 96 Ill. App. 3d 909, 422 N.E.2d 135; *Arthur Rubloff & Co. v. Drovers National Bank* (1980), 80 Ill. App. 3d 867, 400 N.E.2d 614; *Borrowdale v. Shepherd* (1967), 94 Ill. App. 2d 1, 236 N.E.2d 436.) A court is required to construe the provisions of such a contract so as to give effect to the intention of the parties, and where the terms are unambiguous, the parties' intent must be determined solely from the language of the instrument itself. (*Continental Assurance Co. v. Commonwealth Edison Co.* (1990), 194 Ill. App. 3d 1085, 1088, 551 N.E.2d 1054.) The parties' intent must be determined from the instrument as a whole, and it is presumed that the parties inserted each provision deliberately and for a purpose. (*Shelton v. Andres* (1985), 106 Ill. 2d 153, 159, 478 N.E.2d 311; *In re Marriage of Holderrieth* (1989), 181 Ill. App. 3d 199, 202, 536 N.E.2d 946.) The terms and provisions of the instrument may not be construed in a manner which is contrary to or different from the plain and obvious meaning of the language used. *In re Marriage of Holderrieth*, 181 Ill. App. 3d at 202.

■ In the case before us, the plaintiff agrees that the contract is unambiguous: the brokerage agreement specifically stated that a commission would be paid to the plaintiff only "if a mutually satisfactory lease [was] negotiated and fully executed." A contract is ex-

ecuted when nothing remains to be done by either of the parties. (12 Ill. L. & Prac. *Contracts* §2, at 241 nn. 22, 23 (1983), citing *Fox v. Kitton* (1858), 19 Ill. 518.) The lease would not be executed by the defendant until the lease was at least signed by the defendant. (See *Stuart v. Dutton* (1866), 39 Ill. 91.) The language of the agreement clearly established that the plaintiff was entitled to collect a commission only if the lease negotiations were consummated and the property owner actually leased the subject property to Schwartz Cooper. It is undisputed that the property owner never signed the final draft of the lease, and consequently, the lease was not "fully executed." Thus, under the express terms of the brokerage agreement, the defendants were not obligated to pay the plaintiff a commission where the final draft of the lease was signed by Schwartz Cooper but was never reviewed or executed by the property owner. This court cannot remake the contract to give the plaintiff a better bargain than the plaintiff itself was satisfied to make; the terms of this unambiguous contract must be enforced. See *Michigan Avenue National Bank v. Evans, Inc.* (1988), 176 Ill. App. 3d 1047, 531 N.E.2d 872.

The cases cited by the plaintiff do not support its position. In *Webster v. Hochberg* (1969), 105 Ill. App. 2d 466, 245 N.E.2d 529, the owner of the property and the purchaser *had in fact signed an agreement* which was rescinded because of fraud on the part of the owner of the property. Similarly, in *Goldstein v. Rosenberg* (1947), 331 Ill. App. 374, 73 N.E.2d 171, the seller and purchaser had both signed a contract for the sale of the property. It is fair to assume that in both *Webster* and *Goldstein*, the purchaser would have been entitled to specific performance.

We do not understand the plaintiff's citation of *Chapman v. Illinois Midwest Joint Stock Land Bank* (1939), 302 Ill. App. 282, 23 N.E.2d 744. That case supports the defendants' position. In denying recovery to the broker, the court said the following:

"A real estate broker is entitled to his commissions when he has furnished a purchaser, with whom the principal *enters into a valid contract* [citation], and this is true though the actual transfer of the property is never made. [Citation.]

It is likewise true if one or both parties to the contract refuse to comply with the contract. [Citations.] *But where there is no complete contract of sale unless the seller approves the offer, no commission is required to be paid until such approval is shown* [citation]. Under such circumstances the burden is on the plaintiff broker suing for commissions, to show that he actually brought

about a consummation of a sale, or was prevented from doing so by the owner (*Jackson v. Kohler* [(1919)], 289 Ill. 444[, 124 N.E.2d 650]).'' (Emphasis added.) (302 Ill. App. at 287.)

In *Jackson v. Kohler*, cited in *Chapman*, the broker did bring the purchaser and seller of property together, and they did enter into a contract for the sale of the property.

We hold that the plaintiff was not entitled to collect its commission where the property owner never executed the lease with Schwartz Cooper as required by the brokerage agreement. We affirm the judgment.

We need not address the plaintiff's claim that the trial court erred in admitting evidence of mitigation of damages.

Judgment affirmed.

McNAMARA and RAKOWSKI,* JJ., concur.

---

*Justice Rosemary LaPorta participated in oral argument before her death. Justice Thomas Rakowski was substituted on the panel. He has listened to the oral argument tape and has read the briefs.