RE/MAX R.E. PROFESSIONALS, INC., Plaintiff-Appellee, v. GARY R. ARMSTRONG *et al.*, Defendants-Appellants.

Fourth District    No. 4—96—0837

Opinion filed May 28, 1997.

COOK, J., specially concurring.

Raymond R. Kimpel, of Champaign, for appellants.

John E. Reeves, of Goldstein & Reeves, of Urbana, for appellee.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In March 1991, plaintiff, RE/MAX R.E. Professionals, Inc. (RE/MAX), filed a two-count complaint against defendants, Gary R. Armstrong and Jane Armstrong, alleging that it was entitled to recover a real estate commission under the terms of a listing agreement and a withdrawal agreement. In January 1995, RE/MAX filed a motion for summary judgment as to count I (breach of contract), and in March 1995, the trial court granted RE/MAX's motion. The Armstrongs appeal, arguing that (1) the docket entry did not constitute an entry of judgment; and (2) the court erred by granting RE/MAX's motion for summary judgment. We reverse and remand.

## I. BACKGROUND

The following facts appear from the complaint, depositions, affidavits, and attached documents. On July 25, 1990, RE/MAX and the Armstrongs signed a "RESIDENTIAL LISTING AGREEMENT"

(listing agreement) granting RE/MAX the exclusive right to sell real estate owned by the Armstrongs. The listing agreement provided, in relevant part, as follows:

> "If, during the term of this agreement, anyone, including myself [(the Armstrongs)], produces a purchaser, ready, willing and able to purchase said property *** I agree to pay you a commission of *5%—FIVE PERCENT*. Said commission shall be paid on closing the sale herein contemplated or upon failure by the purchaser or me to perform under the contract of sale. ***
>
> The term 'sale' as used herein shall be construed to include *any exchange to which I consent in writing*." (Emphasis added.)

On August 8, 1990, Gary telephoned RE/MAX and informed one of its brokers that the Armstrongs were no longer interested in selling their property. On August 10, 1990, Gary signed a "UNIFORM LISTING WITHDRAWAL AGREEMENT" (withdrawal agreement). The withdrawal agreement became effective on August 13, 1990, and provided, in relevant part, as follows:

> "(2) Should said property be *sold* or exchanged within 90 days from the effective date hereof, through any source, to any person or organization, I agree to pay you a commission in the amount provided in the listing agreement.
> ***
> (4) This withdrawal agreement does *not* invalidate any part of the original listing agreement *except* with respect to the enactment of this withdrawal agreement *exactly as stated on this form*." (Emphasis added.)

During mid-August 1990, the Armstrongs showed their property to the ultimate buyers, Charles Miller and Jacqueline Cardinale (the buyers). Shortly thereafter, the buyers visited the Armstrong property again, and the Armstrongs quoted them a price of approximately $100,000. The Armstrongs then went on vacation and arrived back home in late September 1990. A few days later, the buyers looked at the property for the third time. A week or so later, the buyers made a counteroffer, and the Armstrongs accepted it. Although the Armstrongs and the buyers reached a verbal agreement on all of the terms of the sale, they never entered into a written sales contract for the subject property. On November 13, 1990, they closed the sale of the subject property.

In March 1991, RE/MAX filed a complaint against the Armstrongs to recover a real estate commission under the terms of the listing and withdrawal agreements. In January 1995, RE/MAX filed a motion for summary judgment as to count I, and the trial court subsequently granted the motion. In September 1996, RE/MAX moved for a voluntary dismissal of count II (fraud) and a final and appealable judgment as to count I, which the court granted.

## II. ANALYSIS

### A. Entry of Judgment

■ The Armstrongs first argue that the docket entry in this case does not constitute an entry of judgment. The Armstrongs specifically contend that when a plaintiff seeks money damages only, the judgment "must state the amount of money the judgment calls for."

The Armstrongs have waived their contention regarding an alleged deficiency in the judgment by failing to cite any relevant authority in support of their claim as required by Supreme Court Rule 341(e)(7). See 155 Ill. 2d R. 341(e)(7); *People v. $1,124,905.00 United States Currency*, 269 Ill. App. 3d 952, 956, 647 N.E.2d 1028, 1031 (1995). In this portion of their brief, the Armstrongs cite only one case; yet that case has nothing to do with the argument they make.

### B. The Trial Court's Grant of RE/MAX's Motion for Summary Judgment

The Armstrongs argue that the trial court erred by granting RE/MAX's motion for summary judgment. The Armstrongs specifically contend that their property was "sold" on November 13, 1990, the closing date (which occurred after the 90-day period set forth in the withdrawal agreement). Although we disagree with that contention, we nonetheless conclude that the trial court erred by granting RE/MAX's motion for summary judgment.

■ Summary judgment is proper when (1) the resolution of a case hinges on a question of law, and (2) the moving party's right to judgment is clear and free from doubt. *Truman L. Flatt & Sons Co. v. Schupf*, 271 Ill. App. 3d 983, 986, 649 N.E.2d 990, 993 (1995). In considering a motion for summary judgment, the trial court must consider the affidavits, depositions, pleadings, and exhibits on file and has a duty to construe the evidence strictly against the movant and liberally in favor of the nonmoving party. *In re Estate of Hoover*, 155 Ill. 2d 402, 410-11, 615 N.E.2d 736, 739-40 (1993). The trial court will grant the motion if it finds no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Watkins v. Schmitt*, 172 Ill. 2d 193, 203, 665 N.E.2d 1379, 1385 (1996); 735 ILCS 5/2—1005(c) (West 1994).

A reviewing court's role is to consider anew the facts and law relating to the case and determine whether the trial court was correct in finding that no genuine issue of material fact exists, and if none exists, whether the court correctly entered the judgment as a matter of law. *Kellner v. Bartman*, 250 Ill. App. 3d 1030, 1033, 620 N.E.2d 607, 609 (1993).

■ The rights and obligations of a real estate broker are determined by the terms of the listing or other brokerage agreement. *Bennett & Kahnweiler, Inc. v. American National Bank & Trust Co.*, 235 Ill. App. 3d 896, 905, 601 N.E.2d 810, 816 (1992). Where the agreement terms are unambiguous, the parties' intent must be determined solely from the language of the agreement. *Bennett*, 235 Ill. App. 3d at 905, 601 N.E.2d at 816. The interpretation of an unambiguous written contract is a question of law. *Kellner*, 250 Ill. App. 3d at 1033, 620 N.E.2d at 609. Likewise, the determination of whether an ambiguity exists is also a question of law. *Kellner*, 250 Ill. App. 3d at 1033, 620 N.E.2d at 609.

In this case, the facts are not controverted; instead, the parties disagree about the legal effect of the contract terms and the actions of the Armstrongs and the buyers. Thus, the question before us is whether the trial court erred by granting RE/MAX's motion for summary judgment as a matter of law based on those facts.

The terms of the listing agreement and the withdrawal agreement are unambiguous. The withdrawal agreement clearly provides that it does *not* invalidate any part of the listing agreement except with respect to those provisions "exactly as stated" in the withdrawal agreement. Thus, whenever the withdrawal agreement and the listing agreement disagree regarding any provision explicitly stated in the withdrawal agreement, the withdrawal agreement prevails. This record shows such a disagreement existed. The withdrawal agreement invalidates that portion of the listing agreement that provides that the Armstrongs owed RE/MAX a commission if a "ready, willing and able" purchaser was produced during the term of the listing agreement or if, within 180 days after the expiration of the term, "a sale is made to any person to whom the property was shown, by anyone, including [the Armstrongs] during said term." Instead, the withdrawal agreement explicitly provides that the Armstrongs owed RE/MAX a commission if the subject property was "*sold* or exchanged within 90 days from the [August 13, 1990,] effective date [of the withdrawal agreement]." (Emphasis added.)

In addition, the remaining valid portions of the listing agreement unquestionably provide that a "sale" does *not* encompass a verbal agreement to sell real estate. The listing agreement states that "[t]he term 'sale' as used herein shall be construed to include *any* exchange to which [the Armstrongs] consent *in writing*." (Emphasis added.) Therefore, the terms of the listing and withdrawal agreements provide that RE/MAX was entitled to a commission only if the Armstrongs entered into a *written* contract for the sale (or other exchange) of their property during the term of the withdrawal agreement.

■ It is uncontroverted that, although the Armstrongs and the buyers reached a verbal agreement as to all the terms of the sale within the 90-day period set forth in the withdrawal agreement, they *never* entered into a written contract for the sale of the subject property. RE/MAX concedes as much in its brief ("There was no written residential sales contract").

We conclude that (1) the Armstrong's property was not "sold" within the 90-day period for purposes of entitling RE/MAX to a commission, and (2) RE/MAX was not entitled to judgment as a matter of law. Accordingly, we hold that the trial court erred by granting RE/MAX's motion for summary judgment.

We note in passing that, on appeal, RE/MAX argues as if the withdrawal agreement states the following: "If the property is sold or exchanged *or a verbal or written agreement* for the sale of the property is entered into within 90 days from the effective date of the withdrawal agreement, the seller agrees to pay RE/MAX a commission in the amount provided in the listing agreement." Clearly, that is not what the terms of the withdrawal agreement provide. If that is what RE/MAX wants the withdrawal agreement to provide, then it should write the agreement so that it states exactly that.

In addition, we note that if the terms of the listing and withdrawal agreements had been ambiguous and required construction, we would construe those terms strictly against RE/MAX because the agreements are adhesion contracts. See *Abbott v. Amoco Oil Co.*, 249 Ill. App. 3d 774, 781, 619 N.E.2d 789, 795 (1993) ("generally, burdensome clauses in adhesion contracts should be construed against the more powerful party").

### III. CONCLUSION

For the reasons stated, we reverse the trial court's grant of RE/MAX's motion for summary judgment and remand for further proceedings consistent with the views expressed herein.

Reversed and remanded.

GARMAN, J., concurs.

JUSTICE COOK, specially concurring:

On July 25, 1990, the Armstrongs executed a listing agreement purporting to be a bilateral contract that gave RE/MAX the exclusive right to sell their property. Two weeks later, on August 8, the Armstrongs notified RE/MAX they were no longer interested in selling, and the parties executed a withdrawal agreement. A few days later,

the Armstrongs showed the property to the Millers. The Armstrongs reached a verbal agreement with the Millers, apparently in October, and on November 13, 1990, two days after the expiration of an extension period provided for in the withdrawal agreement, the sale was closed.

A broker is entitled to a commission if the broker has an exclusive sale agreement with the owner and the property is sold by anyone during the life of the agreement. *Wilson v. Middendorf*, 248 Ill. App. 3d 870, 872, 619 N.E.2d 179, 180 (1993). A broker is also entitled to a commission if the owner acts in bad faith to cause the sale to occur after the life of the agreement. Restatement (Second) of Agency § 446, Comment *e* (1958); *Bear Kaufman Realty, Inc. v. Spec Development, Inc.*, 268 Ill. App. 3d 898, 902-04, 645 N.E.2d 244, 247-48 (1994). Although the circumstances here are suspicious, there is no evidence that either RE/MAX or the Armstrongs dealt with the Millers prior to August 13, the effective date of the withdrawal agreement (the date the listing agreement was terminated). RE/MAX in fact dismissed its count II, which had alleged that the Armstrongs were guilty of fraud or bad faith.

RE/MAX's sole argument is that it is entitled to a commission by virtue of the language of the withdrawal agreement, which provides for a commission "[s]hould said property be sold or exchanged within 90 days from the effective date hereof, through any source." That language is very unusual, because it seems to make the owner liable for a commission after the listing agreement has expired, even if the purchaser had absolutely no connection with the property during the term of the listing agreement. Extension agreements such as this are intended to protect the broker from a defrauding owner who waits until just after the expiration of the initial listing period before selling to a purchaser with whom the broker has previously conducted negotiations. D. Burke, Real Estate Brokers § 2.11, at 2:112 (2d ed. 1992).

Extension agreements are discussed in a number of Illinois cases. The agreements in those cases require contact during the period of the listing agreement. See, *e.g., Tom Brinkoetter & Co. v. Cresthaven Country Club, Inc.*, 118 Ill. App. 3d 554, 556, 559-60, 454 N.E.2d 1182, 1183, 1185-86 (1983) (purchaser with whom there were negotiations "during the term of this exclusive listing" (emphasis omitted)); *Pilson v. Roush*, 82 Ill. App. 3d 187, 188, 402 N.E.2d 906, 907 (1980) (person "with whom you have negotiated"); *Kokinis v. Kotrich*, 81 Ill. 2d 151, 155, 407 N.E.2d 43, 45 (1980) (purchaser to whom it was submitted or shown during the term of the agreement); *Busch v. Eisin*, 96 Ill. App. 3d 909, 910, 422 N.E.2d 135, 136 (1981) ("to a purchaser to whom it was offered during the period hereof").

The explanation here is apparently found in the original listing agreement, which also contained an extension clause, providing for a commission, "if, within 180 DAYS after the expiration of said term, a sale is made to any person *to whom the property was shown*, by anyone, including myself, *during said term.*" The withdrawal agreement indicates that it changes the listing agreement only "exactly as stated" in the withdrawal agreement. The 90-day extension period in the withdrawal agreement should accordingly be read to require that the purchaser be one "to whom the property was shown" during the term of the listing agreement. Any other interpretation of the withdrawal agreement (*e.g.*, absolute liability intended as a penalty, absolute liability intended to eliminate broker's need to present evidence) would raise serious questions of overreaching on the part of the draftor, RE/MAX.

In the present case, there is no indication the property was shown to the Millers during the term of the listing agreement (July 25, 1990, to August 13, 1990), by either RE/MAX or the Armstrongs. Accordingly, RE/MAX was not entitled to a commission under the withdrawal agreement, and the trial court erred in entering summary judgment in its favor. It was not improper for the Armstrongs to show the property to new prospects after August 13. RE/MAX's exclusive right to sell ended on August 13, when the listing agreement terminated.

The Armstrongs argue that there could be no "sale" under the withdrawal agreement because there was no closing during the 90-day extension period. Different considerations apply to the term of the listing agreement (July 25, 1990, to August 13, 1990), and to the term of the extension agreement (August 13, 1990, to November 11, 1990). It is generally not necessary that a sale be closed during the term of a listing agreement; it is only necessary that the broker produce a purchaser who is ready, willing, and able to purchase the property on the prescribed terms. A broker may establish his right to a commission by a legally binding contract of sale. *Hallmark & Johnson Properties, Ltd. v. Gadea*, 218 Ill. App. 3d 921, 926-27, 578 N.E.2d 1180, 1184 (1991); *Busch*, 96 Ill. App. 3d at 911-13, 422 N.E.2d at 137-38. That might not be the case with an extension agreement like the present one, where the language regarding the entitlement to commission is so different from the listing agreement, especially if the extension agreement is read to make the owner absolutely liable for a commission on any sale. In my view, however, it is not necessary to address the Armstrongs' argument that a closing was required.

I disagree with the majority's statement that the language of the

listing agreement requires that a sale be in writing. The listing agreement provides that "[t]he term 'sale' as used herein shall be construed to include any exchange to which I consent in writing." The purpose of that language is to make it clear that an "exchange," which is arguably not a "sale," is to be treated as a "sale." The majority erroneously reads the word "exchange" broadly, as "any type of transaction," and concludes that any type of transaction that is in writing will constitute a sale. Other language in the agreement makes it clear that an "exchange" is an "exchange of properties," and not every conceivable transaction. Even if a sale "included" all exchanges that were in writing, that would not rule out the possibility there could be some sales that were not in writing.

I do agree with the majority that a legally binding contract for the sale of real estate must be in writing. 740 ILCS 80/2 (West 1994). If the Armstrongs and the Millers acted in bad faith to cause the sale to occur after the appropriate period, however, there would be liability for a commission although no written contract had been executed. There is no liability for a commission in this case because the property was not shown to the Millers by anyone during the appropriate period, the term of the listing agreement. Even if there had been a written agreement (or for that matter, a closing) during the extension period, there would be no right to a commission unless the Millers were persons "to whom the property was shown" during the term of the listing agreement.