KENNETH VINCENT, Plaintiff-Appellant, v. EUGENE DOEBERT *et al.*, Defendants-Appellees (La Salle National Bank of Chicago, as Trustee, *et al.*, Intervenors-Appellees).

Second District   No. 2—88—0947

Opinion filed June 1, 1989.—Rehearing denied June 30, 1989.

Robert J. Weber, Ltd., of Chicago (Robert J. Weber, of counsel), for appellant.

Thomas J. Streit, of Dreyer, Foote, Streit, Furgason & Slocum, P.A., of Aurora (William J. Foote, of counsel), for appellees Eugene Doebert, Dolores J. Doebert, Tommy Cole, and Marilyn Cole.

Goldsmith, Thelin, Schiller & Dickson, of Aurora (Richard D. Schiller, of counsel), for appellees La Salle National Bank of Chicago and Joseph J. Freed.

JUSTICE NASH delivered the opinion of the court:

Plaintiff, Kenneth Vincent, appeals from a summary judgment entered in this declaratory judgment action in favor of intervenor-appellees, Joseph J. Freed and La Salle National Bank of Chicago, as trustee. Defendants Eugene Doebert, Dolores J. Doebert, Tommy Cole, and Marilyn Jean Cole have also filed a brief as appellees, in which they are described as stakeholders and urge affirmance of the judgment below.

The controversy in this case evolves around the question of whether plaintiff, Vincent, or intervenor, Freed, has the right to purchase a commercial corner at the intersection of Route 31 and New Indian Trail Road in the City of Aurora. Defendants, the Doeberts and Coles, are owner-lessors of the property which is held by plaintiff, Vincent, under a long-term lease, and who conducts a used car business on the premises. Intervenor Joseph Freed owns or is purchasing the area surrounding the subject property for development of a shop-

ping center and wishes to acquire it for that purpose. The lease under which Vincent holds possession has a term to 1998, and contains three five-year options to extend it. The lease also contains a right of first refusal given therein by the lessors to the lessee to meet any *bona fide* offer from a third party to purchase the property during the term of the lease. Intervenor Freed, through his land trustee bank, entered into an agreement with the owner-lessors to purchase the property, after being unable to acquire Vincent's interest in it. The issue to be resolved on this appeal is whether Vincent did or did not correctly exercise his right of first refusal so as to be entitled to purchase the property on the material terms and conditions of Freed's third-party offer to its owners.

The lease was originally entered into in December 1978, between the Doeberts and Coles, as lessors, and Judico, Inc., as lessee. Plaintiff, with the consent of lessors, acquired the Judico interest in the lease in 1983 and occupies the premises. The provision of the lease relevant to this appeal states as follows:

> "26. Right of First Refusal. Lessors do hereby grant to Lessee a right of first refusal with reference to the possible future sale of the premises, including that portion covered by the separate option provided for in Paragraph 27. In the event that Lessors receive a *bona fide* offer from a third party to purchase the premises during the original term of the lease or during any option term thereof, *the Lessee shall have the right to purchase the premises on the same terms and conditions as being offered by the third party.* Upon receipt of the third party offer, Lessors shall notify the Lessee in writing of the material terms of the offer. The Lessee shall have thirty (30) days form [*sic*] the date of the notice to advise the Lessors in writing of Lessee's intention to purchase the property on the same terms and conditions as offered by the third party." (Emphasis added.)

On May 15, 1986, the owners caused a notice to be sent to Vincent, signed by their attorney, advising Vincent, pursuant to the right of first refusal provision of the lease, that they had received an offer to purchase the premises from a third party. The terms of the offer were stated in the notice to include a purchase price of $330,000, with a down payment of $75,000 and the $255,000 balance to be paid in monthly installments of $2,695.37 over a 119-month period and the balance to be due on the 120th month. Interest was to be paid at the rate of 9% per annum and there could be no prepayment without the consent of the lessors. Closing of the transaction was scheduled for on or about July 1, 1986. The notice further stated:

"To secure the payment of the purchase price, the Purchaser shall grant to the Lessors a first mortgage on the premises *along with a personal guarantee of an individual whose financial net worth is to be not less than $10,000,000*. The Purchaser shall have the right to obtain a release of the first mortgage if the Purchaser supplies the Lessors with substitute security in the form of a letter of credit or other acceptable security in an amount not less than the amount of the purchase price then due the Lessors." (Emphasis added.)

The notice stated that, as provided in the lease, the lessee shall have 30 days from its date to advise lessors in writing of his intent to purchase the premises on the same terms and conditions set forth in the notice, as offered by the third party.

The record of this case also discloses that on May 22, 1986, the owner-lessors, as sellers, and the La Salle National Bank, as trustee, and as purchaser, entered into a real estate sales contract which acknowledged Vincent's interest in the property as a lessee with a right of first refusal of a third-party offer to purchase it. The terms of the sales contract between the owners and the Freed trustee are substantially as stated in the earlier notice sent to Vincent, except that it makes no reference to a requirement or offer by Freed that the payment of the purchase price shall be further secured by the "personal guarantee of an individual whose financial net worth is to be not less than $10,000,000," as is represented in the notice of the offer given to Vincent by the lessors' attorney. The sales contract did provide, however, that the promissory note for the $255,000 balance would be secured by a first mortgage on the premises, "and the personal guarantee of Joseph J. Freed."

A letter dated June 10, 1986, by Vincent's attorney directed to the lessors' attorney, stated in response to the notice that Vincent intended to exercise his right to purchase the property under the right of first refusal terms of the lease. The letter stated that the terms of the offer set forth in the notice would be met, except for the paragraph requiring the personal guarantee of an individual whose net worth was not less than $10 million. Vincent considered that requirement to be arbitrary and to not conform with normally accepted standards in this type of transaction, noting that the $330,000 price would be secured by the property and the $75,000 down payment. Vincent offered to pay the $330,000 purchase price in full if the owners were interested in an outright sale and, if not, to proceed as referred to in the owner's notice, except as to the condition relating to the purchaser's net worth.

The owners responded, by letter from their counsel to Vincent's attorney, that they did not want to proceed with an outright sale and also that the owners required an ironclad personal guarantee and would not rely solely on the security of a first mortgage for the $255,000 balance. The owners' attorney stated in the letter that he considered that any exercise by Vincent of his right of first refusal which does not include the requirement of "a personal guarantee by a person or persons who have substantial financial net worth" does not meet the terms of the Freed offer already received. Vincent was further advised that the July 1, 1986, closing date was a material term of the Freed contract.

There apparently was further conversation between the attorneys for Vincent and the owners relating to the sale of the property and, on June 27, 1986, the latter wrote a letter to Vincent's attorney purporting to memorialize the status of the matter. In it the owners' attorney acknowledged being advised that Vincent intended to exercise his right of first refusal and would sign the same note and mortgage negotiated with the third party, Freed, who had offered to purchase the property, an offer Vincent intended to meet. Further, Vincent would personally guarantee the note and his personal guarantee would be secured by a $255,000 irrevocable letter of credit from the Northern Trust Company in favor of the sellers. The owners' attorney advised that the closing (with Vincent) had to be no later than the morning of July 1, 1986, as the third party's (Freed's) contract was scheduled to close on the afternoon of that day. Counsel enclosed in his letter a copy of the note, mortgage and personal guarantee that the third party had agreed to sign if he purchased the property.

As the letter of credit could not be secured by Vincent by July 1, this action was commenced to protect his interests, and the Freed closing on July 1 was delayed. Vincent received a written commitment from Northern Trust on July 31, 1986, that it would issue a 10-year letter of credit for $255,000 upon its approval of the sellers' terms and conditions. Subsequently, the trial court required both Vincent and the Freed interests to deposit in court sums of money corresponding to those required under the sales contract and both thereafter to make the required monthly payments. The owners have received from the clerk of court one such deposit of $75,000 representing the down payment, and they also receive each month one of the installments deposited by the parties.

The defendants and the Freed interests answered Vincent's complaint and Vincent's subsequent motion for summary judgment was denied by the trial court and the motion by the intervenor, Freed, was

granted. The trial court found, as a matter of law, that the intervenors were entitled to judgment as they had made a *bona fide* offer to purchase the property which was communicated to Vincent, who had failed to timely or properly exercise his right of first refusal. The court specifically found that the description in the intervenor's offer of the person who would guarantee the transaction as being one whose net worth was not less than $10 million was accurate and proper.

Vincent contends that to require as a condition of the exercise of his right of first refusal that he match the economic status of a person making an offer on the property violated the lease and destroyed the right of first refusal in it. As other issues improperly mixed into his first contention, Vincent also argues that the requirement that lessee produce a guarantor worth $10 million was not a term of the third-party Freed offer and, if it was, that it was unreasonable. Vincent also contends that, as there are controverted issues of fact as to the terms of the lease and the sales agreement, summary judgment was improperly granted to the intervenors.

The intervenors respond that the owners did not seek to modify the terms of the lease and that Vincent had the right to purchase the property only if he met the exact terms of the third-party offer; that Freed's net worth was a material term of the offer as it relates to the quality of the security for the balance of the purchase price; that the requirement of a personal guarantee by a "$10,000,000 person" is a material and reasonable term of the offer and is enforceable; and that summary judgment was proper as no material disputed issues of fact remain.

The defendant-owners do not offer any case authority from Illinois or other jurisdiction but argue that the summary judgment in favor of the intervenors was proper and should be affirmed. They did not address in their brief whether they consider that a $10 million net worth status was required to purchase the property or was a proper and necessary condition which must have been met by Vincent to exercise his right of first refusal, nor do defendants disclose whether or not they considered that the letter of credit offered by Vincent met the security conditions of the Freed offer. These appellees simply say that Vincent did not provide a letter of credit by July 1, 1986, and they had no option but to close with Freed.

During oral arguments, the owners' counsel conceded that the intervenors' offer to purchase did not include a requirement of a $10 million guarantee, and counsel argued that Vincent knew that this requirement was not to be interpreted literally as it was not part of in-

tervenors' offer and that the owners were only seeking an ironclad guarantee. Counsel also conceded that the owners' notice to Vincent of a *bona fide* offer on May 15, 1986, did not start the 30-day period in which Vincent was required, under the terms of the lease, to notify the owners of his intent to exercise his right of first refusal. Counsel for intervenors argued that the $10 million guarantor requirement was not a material issue of intervenors' motion for summary judgment and that what was required to meet the offer was some security over and above a mortgage on the property being purchased. Counsel, however, also argued that the $10 million guarantor requirement was a material term of intervenors' offer that plaintiff was required to meet. When pressed during oral arguments to reconcile his incongruous arguments, it is our understanding that counsel stated that intervenors' offer included a $10 million guarantor requirement for purposes of reviewing the trial court's order granting intervenors' motion for summary judgment and, if this court reviews the trial court's denial of Vincent's motion for summary judgment, that the owners only required Vincent to provide reasonable security to meet the Freed offer.

The defendant-owners request that if the trial court is reversed and the cause remanded, this court include "appropriate" instructions to protect the rights of the owners, whether the purchaser be Freed or Vincent. We are not advised as to the form or subject matter of any instructions to which the owners refer.

▪ Initially, we note that a reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive legal arguments presented (*Thrall Car Manufacturing Co. v. Lindquist* (1986), 145 Ill. App. 3d 712, 719, 495 N.E.2d 1132), and issues not sufficiently presented can be waived (*Pecora v. Szabo* (1982), 109 Ill. App. 3d 824, 826, 441 N.E.2d 360). Vincent's first contention sets forth multiple issues and other issues not stated there are contained in his argument. He integrates discussion of some issues with other issues; for example, Vincent contends, citing cases from other jurisdictions, that the terms offered to the holder of a right of first refusal must be exactly the same as those offered by a prospective purchaser. Plaintiff then posits that "[t]hese cases exemplify that the general rules for construction of a contract are to be applied to a lease which contains a right of first refusal or an option. The unilateral modification of the lease by insertion of a requirement not expressly contained therein constitutes a breach, and can be ignored by the tenant." Vincent erroneously suggests that the issue whether the lease permits the owners to require him to provide a guarantee of $10 million is

somehow related to the issue of whether the intervenors' offer to purchase the property actually included a guarantee of $10 million. While Vincent's argument is made in a disarranged and confusing manner, we have attempted to distill the key issues sought to be presented.

■ Vincent contends that because the lease giving him a right of first refusal did not contain a provision requiring him to meet the economic stature of a prospective purchaser of the property, the owners' notice of the third-party offer, as it related to net worth of the purchaser, constituted an unenforceable, unilateral modification of the lease agreement as a matter of law. Vincent relies on *Braeside Realty Trust v. Cimino* (1985), 133 Ill. App. 3d 1009, 479 N.E.2d 1031, which we find does not support his argument; nevertheless, an analogous argument was made in *Hayes v. O'Brien* (1894), 149 Ill. 403, 37 N.E. 73. There, the lease provided that the lessee had the right to purchase the leased premises upon the terms and at the same price as that offered by a prospective purchaser. The lessor argued that this provision in the lease was void because of lack of certainty in that no price was stated in the agreement. (*Hayes*, 149 Ill. at 413-14.) The court held that the right-of-first-refusal provision was unambiguous and that only one construction of the provision was possible; the lessee had the right to purchase the property upon the same terms and price as that offered by a prospective purchaser. (*Hayes*, 149 Ill. at 415.) So, too, in the present case, Vincent had the right to purchase the property on the same terms and conditions as that offered by a prospective purchaser. (See, *e.g.*, *Morris v. Goldthorp* (1945), 390 Ill. 186, 195, 60 N.E.2d 857; *Department of Public Works & Buildings v. Halls* (1966), 35 Ill. 2d 283, 285, 220 N.E.2d 167; *Turner v. Shirk* (1977), 49 Ill. App. 3d 764, 766, 364 N.E.2d 622; *Cohen v. Meola* (1980), 37 Conn. Supp. 27, 429 A.2d 152; *C. Wayne Motors, Inc. v. Somers* (1981), 81 A.D.2d 964, 439 N.Y.S.2d 746.) The parties really do not disagree as to that proposition in the present case.

■ Vincent also argues that the offer to purchase made by Freed to the defendant-owners does not refer to the requirement inserted in the owners' notice to Vincent that the balance of the purchase price be guaranteed by a person whose net worth is not less than $10 million. Vincent is correct in this assertion as the offer made by Freed simply provided that payment of the balance would have "the personal guarantee of Joseph J. Freed." In the summary judgment proceedings, the factual gap was sought to be closed by intervenor Freed's attorney, who filed his personal affidavit that Freed had given the owners evidence of his net worth, which was $10 million, and that the owners relied upon it in agreeing to the financial arrangements in

Freed's offer. Vincent did not challenge the affidavit, which may have infirmities under Rule 191 (107 Ill. 2d R. 191), or file counteraffidavits. It seems unlikely that the disputed question of fact, whether the financial status of the third-party offeror was a material or an actual part of his offer to purchase, could be resolved by this means. It also seems doubtful that such status, as a necessary element of the offer to be met by Vincent in order to exercise his right of first refusal, could be established even by affidavits to that effect by the owners, or by their testimony, as the owner-intervenor land contract did not so provide.

It is clear that to meet the "security" aspect of Freed's offer, as actually made by him, Vincent would have to also guarantee the balance of the purchase price. The Freed offer required that Freed do so but does not refer to any net worth requirement. Vincent also offered to personally guarantee the note and also to further secure it by letter of credit. As the owners correctly agreed in oral argument of this case, Vincent thereby did offer to meet the material terms and conditions of Freed's offer and was entitled to exercise his right of first refusal.

■ Any other conclusion here would have unsettling consequences. Under the intervenor's theory, a party having the contractual right of first refusal would ordinarily be unable to exercise it where a Trump or Rockefeller was the third-party offeror. Would a time-payment offer, as in this case, which has been made by a 50-year-old person be met by the same offer made by a 70-year-old, who might not survive the period? If, as in this case, a lessor who has given his lessee the right of first refusal expects to require that the lessee personally match the net worth of a future offeror, that should be made a condition of the lease. We have not seen a case in Illinois, or any other jurisdiction, which has considered a similar assertion. Defendants apparently look for us to state a rule of law that financial status is an implied element of such an offer, and we decline to do so.

We also consider that the defendant-owners realized shortly before the suggested closing date that their position was untenable. Their attorney then noted that the requirement was for a personal guarantee by a person of "substantial" net worth, and the $10 million guarantor was not mentioned. The owners appeared to have accepted, at that point, the offer of Vincent's guarantee and the letter of credit. Certainly that was more security for the $255,000 balance than would be Freed's net worth on that day, as it may well change over the 10-year payment period.

Vincent also contends that Freed's personal guarantee was not a

material term of the intervenors' offer, that this guarantee was a fiction and a sham, and that the guarantee was unreasonable and arbitrary, amounting to bad faith. He argues that a separate purchase agreement between the owners and Freed for the adjacent car-wash property evidences bad faith in that it permitted the intervenor the option of providing a letter of credit for the purchase price or the personal guarantees of Joseph and Joyce Freed. Vincent does not cite any authority to support the proposition that the circumstances surrounding the execution of an unrelated contract can be considered, and we do not address this argument.

■ Vincent argues that the requirement by the owners of a $10 million guarantor for a $255,000 note, which was also to be secured by a first mortgage on the property, is further evidence of their bad faith. A covenant of good faith and fair dealing is implied in every contract as a matter of law, absent an express disavowal. (*Prudential Insurance Co. of America v. Van Matre* (1987), 158 Ill. App. 3d 298, 308, 511 N.E.2d 740.) Good faith between contracting parties requires one vested with contractual discretion to exercise it reasonably and not arbitrarily or capriciously (*Foster Enterprises, Inc. v. Germania Federal Savings & Loan Association* (1981), 97 Ill. App. 3d 22, 30, 421 N.E.2d 1375), and parties to a contract impliedly promise not to do anything which will destroy or injure the other party's right to receive the fruits of the contract (*Prudential Insurance Co. of America,* 158 Ill. App. 3d at 308).

■ It is apparent here that the owners did not act in good faith when they notified Vincent that he had to provide a $10 million guarantor to exercise his right of first refusal as it is clear that this term was not part of the intervenors' offer to purchase. As stated earlier, intervenors' offer only included Freed's personal guarantee of the note and not a requirement of a $10 million guarantee. Subsequent to the owners' notice to Vincent of the intervenors' offer, the owners agreed that a guarantee by a person with a substantial net worth was sufficient, and, ultimately, defendants were satisfied with a $255,000 irrevocable letter of credit. Even more telling are the concessions made by both counsel for intervenors and the owners during oral arguments. The owners' counsel stated that Vincent knew that the $10 million guarantor requirement was not to be interpreted literally and that the owners were merely seeking an ironclad guarantee. Surely, Vincent could not have known this when he received the notice of intervenors' offer, as revised by the owners, as the notice clearly stated that a $10 million guarantor was required. Counsel for the intervenors stated during oral arguments that the $10 million guarantee re-

quirement was not a material issue to their motion for summary judgment and that only a reasonable security was required by Vincent to meet Freed's offer.

From our review of the record and arguments of counsel, Vincent was not notified of the true terms of an offer the owners were willing to accept until June 27, 1986, when they notified him that an irrevocable letter of credit would suffice as security in lieu of a $10 million guarantor. Under the terms of the lease agreement, Vincent then had 30 days in which to notify the owners of his intent to exercise the right of first refusal, and he did so. In these circumstances, defendants could not reasonably insist that plaintiff close the purchase by July 1, 1986. See *In re Estate of Halas* (1988), 175 Ill. App. 3d 180, 183, 529 N.E.2d 768.

Accordingly, the summary judgment entered in favor of the intervenors is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

UNVERZAGT, P.J., and LINDBERG, J., concur.