KENNETH ABBOTT *et al.*, Plaintiffs-Appellants, v. AMOCO OIL COMPANY, Defendant-Appellee.

Second District    No. 2—92—1275

Opinion filed August 18, 1993.

Mark A. LaMantia, of Farrell & Barr, of Rosemont, for appellants.

Richard C. Godfrey and David J. Zott, both of Kirkland & Ellis, and William J. Noble, both of Chicago, for appellee.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

In this case, a large group of gasoline retailers (the dealers) who sell Amoco brand products sued Amoco alleging breach of contract. Specifically, the dealers claimed that Amoco violated express promises it made to them in conjunction with Amoco's "Discount for Cash" program, that Amoco, alternatively, violated the implied covenant of good faith and fair dealing with regard to gasoline pricing, and that Amoco breached either its express or implied obligations with regard to the rent it charged the dealers. The circuit court of Du Page County dismissed the complaint with prejudice under section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1992)) as being substantially insufficient in law. The dealers appealed, and we affirm.

The dealers' complaint alleges that they all are located in a geographic area delineated by Amoco and known as the Chicago District. The dealers were required to execute various forms drafted by Amoco in order to become franchisees, and the terms of the documents were not negotiable. The dealers allege that the price they were to pay for gasoline was not fixed. Instruments known as "Dealer Supply Agreements" (DSA's) executed by the dealers provide, "The price for motor fuels purchased by Dealer from Amoco hereunder, shall be Amoco's dealer buying price for each respective grade of said products in effect in Amoco's pricing area in which the above-identified motor fuel sales facility is located at the time when title to said products passes from Amoco to Dealer."

The dealers further allege that until 1982, Amoco represented that the price of gas to dealers took into account the cost of credit, including the costs of Amoco's credit card program. In 1982, Amoco began to implement its discount for cash program, which the dealers were allegedly required to accept. Under the program, it is claimed that Amoco made the dealers pay a credit card fee for each Amoco credit card purchase occurring at the dealers' respective stations. However, Amoco also promised the dealers a discount in the cost of gas to reflect the removal of the cost of credit from the gas prices. Amoco allegedly told the dealers that the discount for cash program was designed to "unbundle" the cost of credit from the price of gasoline to dealers and that the dealers could then offer a discount on the price of gas to retail customers who paid with cash, allowing the dealers to become more competitive in the growing cash purchase market. The dealers claim in their first count that Amoco then failed to "real-

istically and meaningfully provide the promised price discounts" and that Amoco hid its breaches "through a variety of pricing techniques and policies."

In their second count, the dealers allege that Amoco's actions with regard to the pricing of gasoline violated the implied covenant of good faith and fair dealing implicit in the DSA's.

In the third count, the dealers allege that they are required to lease their stations from Amoco pursuant to written leases. They claim that, since 1982, Amoco has represented to them that rents would be based on the fair-market or investment value of the facilities and improvements. The dealers assumed that Amoco would act in good faith in setting the rental values and claimed that Amoco represented to them that the rentals would be so calculated. The dealers allege that Amoco failed to disclose to them the manner in which it calculated rent and that Amoco charged them for capital improvements that had never existed at the stations, had been removed, had been fully depreciated, were owned by the dealers, or were otherwise charged for under separate agreements. The dealers also claim that Amoco unfairly charged them for signs which were supposed to be loaned to the dealers without charge, that Amoco duplicated service bay and car wash charges, and that Amoco made dealers pay for things such as property taxes and maintenance fees which either were not incurred or were covered in other charges. The dealers allege that these actions by Amoco constitute a breach of contract or a violation of Amoco's duty of good faith and fair dealing.

The dealers did not append any written instruments to their complaint when it was first filed, which violated section 2—606 of the Code of Civil Procedure (735 ILCS 5/2—606 (West 1992)). The circuit court then ordered the dealers to execute an affidavit repeating their claim that the signed copies of the documents at issue were in the hands of Amoco and "point forth with some degree of specificity which agreement or agreements they are relying upon." The dealers' attorney responded with an affidavit reciting his experience in similar lawsuits, reiterating the dealers' claims, and referring the court to documents filed in other cases alleged to be sufficient to spell out representations made by Amoco to the dealers here.

The court found this affidavit insufficient and allowed the dealers to file another affidavit. The dealers then submitted various documents and affidavits. Amoco moved to dismiss the complaint as being substantially insufficient at law (735 ILCS 5/2—615 (West 1992)). The court granted the motion to dismiss, finding that the contracts between the dealers and Amoco gave Amoco discretion to set gas prices

and rents, that the contracts would not be rewritten, and that Illinois does not recognize a cause of action founded upon a breach of the implied covenant of good faith and fair dealing.

On appeal, the dealers argue that the trial judge did not apply the proper standards for deciding motions brought under section 2—615, that the order dismissing the complaint is internally inconsistent and makes unwarranted and unsupported factual assumptions, that counts I and II of the complaint state viable alternative causes of action, and that the dismissal of count III was improper in light of section 2—615 standards and the decisions of other courts.

Amoco argues on appeal that the trial judge properly applied section 2—615 standards below, that the dealers' breach of contract claims contradict the unambiguous terms of the parties' integrated contracts, and that Illinois law does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing.

### SECTION 2—615 STANDARDS

The dealers' first argument on appeal is that the trial judge disregarded the proper standards for deciding a section 2—615 motion when dismissing the dealers' complaint. The dealers argue that the trial judge should have addressed the adhesionary aspects of the DSA's. The dealers also find fault with the court's determining that it had to limit its interpretation of the contracts at issue to the contracts' four corners and its simultaneous finding that the parties understood that the nature of the petroleum market made volatile price fluctuations necessary. The dealers also complain that the contracts at issue did not confer upon Amoco the right to employ cash discount programs, as the trial court found was within Amoco's authority to set fuel prices. The dealers argue further that the court should not have disregarded certain communications in the record from Amoco to various dealers notifying the dealers that Amoco was reducing the processing fee on credit card tickets to 3% and setting the gallonage discount for the Midwest region at 2.1 cents per gallon. The dealers claim that these communications support counts I and II of their complaint. Finally, the dealers argue that the court, when dismissing count III, should not have ignored the adhesionary aspects of the leases or the proceedings in separate but similar cases brought against Amoco.

Pleadings are to be liberally construed so as to do justice between the opposing parties when considering a motion to dismiss. (*Pelham v. Griesheimer* (1982), 92 Ill. 2d 13, 17.) Further, exhibits attached to a

complaint become part of the pleadings, and factual matters in such exhibits which are at odds with a complaint's allegations control over those conflicting allegations. (*Outboard Marine Corp. v. James Chisholm & Sons, Inc.* (1985), 133 Ill. App. 3d 238, 245.) A motion to dismiss does not admit allegations in a complaint that are negated by conflicting facts in an attached exhibit. *Outboard Marine*, 133 Ill. App. 3d at 245.

■ This court recently set forth the standards to be followed with regard to appeals from section 2—615 dismissals:

"For purposes of the appeal of the dismissal pursuant to section 2—615, all well-pleaded facts within the four corners of the amended complaint are regarded as admitted and true, together with all reasonable inferences drawn in the light most favorable to the plaintiffs. [Citation.] An appeal from a section 2—615 dismissal for failure to state a cause of action reviews only the question of the legal sufficiency of the complaint, by ascertaining whether the essential elements of the cause of action were alleged. [Citation.] The ultimate facts to be proved must be alleged, and any evidentiary support or conclusions drawn from the allegations should not be considered in a section 2—615 motion. [Citation.] Therefore, a motion to dismiss for failure to state a cause of action should be affirmed on appeal only where no set of facts can be proved under [the] pleadings which set forth a cause of action entitling the plaintiff to relief." *Bank of Northern Illinois v. Nugent* (1991), 223 Ill. App. 3d 1, 9.

The circuit court stated in its final order that the dealers' claims were without merit and that amendments would be ineffective. We believe that the circuit court's decision was correct, notwithstanding the alleged procedural errors it made. Consequently, we will not discuss the dealers' procedural arguments, but will address the issue of whether sufficient legal claims were set out.

### BREACH OF CONTRACT—PRICING

The DSA's signed by Amoco and the dealers require the dealers to pay Amoco for gasoline at "Amoco's dealer buying price for each respective grade of said products in effect in Amoco's pricing area in which the above-identified motor fuel sales facility is located at the time when title to said products passes from Amoco to Dealer." The DSA's further provide:

"This Dealer Supply Agreement cancels and supersedes all prior written or unwritten agreements and understandings be-

tween the parties pertaining to the matters covered in this Agreement. No obligations, agreement [sic] or understandings shall be implied from any of the terms and provisions of this Agreement, all obligations, agreements and understandings with respect to the subject matter hereof being expressly set forth herein. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering in [sic] this Agreement. No modification or waiver of, addition to, or deletion from the terms of this Agreement shall be effective unless reduced to writing and signed by Dealer and a representative of Amoco authorized to execute this Agreement."

The dealers' claim here is that Amoco promised them a discount in the price of gas to offset credit fees Amoco began to charge on credit card transactions and that Amoco then failed to provide the discounts in a "realistic" and "meaningful" manner, meaning that the dealers thought that Amoco's gas was still priced too high, even after the application of the discount. Thus, the dealers argue, essentially, that Amoco charged too much for its gasoline. This claim is directly contrary to both the integration clause and the provisions of the DSA's allowing Amoco to charge the dealers the price for gasoline in effect in the dealers' geographic area at the time the dealers take title to the gas. In order to escape the language of the DSA's, the dealers argue that the DSA's are adhesion contracts and that the integration clauses should thus be ignored.

■ A contract of adhesion is " 'a standardized contract prepared entirely by one party, and which, due to the disparity in bargaining power between the draftsman and the second party, must be accepted or rejected by the second party on a "take it or leave it" basis without opportunity for bargaining and under such conditions that the second party or "adherer" cannot obtain the desired product or service save by acquiescing in the form of the agreement.' " *Star Finance Corp. v. McGee* (1975), 27 Ill. App. 3d 421, 426, quoting *Walnut Creek Pipe Distributors, Inc. v. Gates Rubber Co. Sales Division, Inc.* (1964), 228 Cal. App. 2d 810, 814-15, 39 Cal. Rptr. 767, 771.

The dealers assert that the DSA's meet the test for contracts of adhesion because they had no say in any of the terms of the agreement and they were required to accept Amoco's terms if they wanted to become franchisees. However, even if the DSA's are adhesion contracts, it does not follow that they are unenforceable. Rather, contracts of adhesion are generally lawful (*Methodist Medical Center v. Taylor* (1986), 140 Ill. App. 3d 713, 719) and "mere disparity of bar-

gaining power is not sufficient grounds to vitiate contractual obligations." (*Streams Sports Club, Inc. v. Richmond* (1983), 99 Ill. 2d 182, 191.) Something beyond adhesion is required to subject a contract to judicial scrutiny. As was stated in *Eisele v. Ayers* (1978), 63 Ill. App. 3d 1039, 1046, "Courts declare adhesion contracts unlawful because the party in the superior bargaining position has taken unfair advantage of the 'adherer' by making the desired product available only if the weaker party accedes to the form of the contract." We agree with *Eisele* that unfair advantage is the key to differentiating between the types of adhesion contracts, but we do not agree with *Eisele*'s implication that the remedy upon finding an onerous provision in an adhesion contract is to render the entire contract unlawful. Clearly, some contracts may be so one-sided as to be utterly unenforceable. (See *Streams Sports Club*, 99 Ill. 2d at 191.) However, we agree with courts which have implied that, generally, burdensome clauses in adhesion contracts should be construed against the more powerful party. *Methodist Medical Center*, 140 Ill. App. 3d at 719, citing *Star Finance*, 27 Ill. App. 3d 421.

■ We do not believe that the dealers have sufficiently pleaded that the DSA's are unfair contracts of adhesion. The dealers have not alleged, for example, how they were damaged beyond the loss of the promised discounts or how Amoco's prices or pricing terms compared with those of other oil companies. Thus, the dealers' assertion that the DSA's are inequitable adhesion contracts is a conclusory allegation unsupported by other factual allegations and is not deemed admitted for purposes of a section 2—615 motion to dismiss. *Panorama of Homes, Inc. v. Catholic Foreign Mission Society, Inc.* (1980), 84 Ill. App. 3d 142, 145.

Absent an adhesionary aspect, we are left with contracts that are clear in their terms and which the dealers do not argue are ambiguous. A court must enforce a contract as written and may not rewrite it to suit one of the parties. (*Gladstone v. McHenry Medical Group* (1990), 197 Ill. App. 3d 194, 203-04.) As written by Amoco and agreed to by the dealers, the DSA's, by virtue of their clear language and their integration clauses, embody the entire price agreement between Amoco and the dealers. Since Amoco could set the price for gasoline, it could logically offer a discount to its dealers as part of its pricing policy. Moreover, as previously noted, the dealers' argument that no "meaningful" or "realistic" discount was given to them actually focuses on the price they paid Amoco for gasoline—a price they now claim is too high. This claim is foreclosed by the DSA's.

IMPLIED COVENANT—PRICING

The dealers argue in the alternative that Amoco violated the covenant of good faith and fair dealing implicit in all contracts in Illinois when Amoco failed to provide the dealers with the promised discount in any "realistic" or "meaningful" manner. The dealers claim that the price provision was an open term that Amoco had discretion in filling, and that Amoco was bound to calculate the price in a manner consistent with the parties' expectations in entering into their relationship— that they would both make a reasonable profit.

Amoco argues that Illinois does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing. Amoco claims that the implied covenant is merely a principle of contract interpretation that does not apply here due to the unambiguous nature of the DSA's.

There is a duty of good faith and fair dealing included in every contract as a matter of law in Illinois. (*Powers v. Delnor Hospital* (1985), 135 Ill. App. 3d 317, 321.) The duty limits the manner in which a party who is vested with discretion under the contract may exercise it by requiring that party to "exercise that discretion reasonably and with proper motive, *** not *** arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Dayan v. McDonald's Corp.* (1984), 125 Ill. App. 3d 972, 990-91, *criticized, Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.* (7th Cir. 1992), 970 F.2d 273.

■ We need not decide whether Illinois law permits an independent cause of action for breach of the implied covenant of good faith and fair dealing in a situation such as this. Even if a cause of action is viable, the dealers have failed to state a claim here. In a contractual relationship like the one between Amoco and the dealers, where the dealers are forced to pay Amoco a gasoline price set by and subject to modification by Amoco, and where both Amoco and the dealers seek to maximize their profits, any increase in gas prices by Amoco will affect the dealers adversely. This cause and effect relationship is obvious. Thus, the dealers cannot complain when Amoco merely exercises the discretion the dealers allowed Amoco to possess. Bad faith or unfairness needs to be pleaded affirmatively in a case like the present one.

The dealers do not include in their pleading any factual allegations which would support their claim that Amoco acted unfairly or in bad faith when setting its gasoline prices. For example, they do not allege that they have been driven out of business or even placed in financial

trouble by Amoco's prices. They do not allege that Amoco's pricing policies or prices were out of line with those of other oil companies. They do not allege that there could not have been legitimate business reasons for Amoco's actions. (See, *e.g., Foster Enterprises, Inc. v. Germania Federal Savings & Loan Association* (1981), 97 Ill. App. 3d 22, 30 (savings and loan's rejection of reasonable market appraisal of real estate because appraisal was too low to allow it "to bail out of a mortgage loan long since gone sour" violated implied covenant).) The dealers simply seek to recover a discount allegedly promised to them and then limited or negated by Amoco's pricing decisions. We believe that allegations of an unexpectedly high price, without more, do not state a claim for breach of the implied covenant of good faith and fair dealing in light of the contractual terms at issue in this case.

The case of *Continental Mobile Telephone Co. v. Chicago S M S A Ltd. Partnership* (1992), 225 Ill. App. 3d 317, is instructive on this issue. In *Continental*, an independent reseller of cellular telephone service sued the cellular telephone transmission system operator from which the reseller purchased mobile telephone service alleging, *inter alia*, breach of the implied covenant of good faith and fair dealing. The reseller and the operator had signed a contract in which the operator was given the right to revise its rates and charges in its sole discretion. (*Continental*, 225 Ill. App. 3d at 320-21.) The operator later changed its rates, which had a detrimental effect on the reseller. (*Continental*, 225 Ill. App. 3d at 321-22.) The appellate court, affirming the trial court's dismissal of the reseller's count alleging breach of the implied covenant of good faith and fair dealing, held that no such claim was stated because both parties were aware at the outset that the operator could raise its rates whenever it chose to do so. (*Continental*, 225 Ill. App. 3d at 324.) The parties' awareness of the operator's rights under the contract "negat[ed] any inference that [the operator's] actions were outside the contemplation of the parties and could be characterized as a breach of good faith." *Continental*, 225 Ill. App. 3d at 324.

Likewise, in this case, the dealers were aware at the time they signed their DSA's that Amoco was reserving the right to set the price in the area in which the dealers were located. The DSA's said nothing about the discount for cash program or any representations made thereunder, even though the DSA's in the record were executed years after the only documents in the record that mention a discount offered to the dealers by Amoco.

The dealers' claim is virtually undistinguishable from the claim made by the reseller in *Continental*. It is similarly without merit. The

dealers distinguish *Continental* because in that case the reseller and the operator actively negotiated the contract at issue (*Continental*, 225 Ill. App. 3d at 320), while here the dealers could not negotiate the terms of the DSA's. While this factor is one to be considered, we are not convinced that it is determinative of the issue of whether a claim for breach of the implied covenant of good faith and fair dealing has been stated. Although the dealers had to accept Amoco's terms in order to become Amoco franchisees, the dealers presumably had other choices as to franchisors in the retail gasoline business.

Moreover, use of the implied covenant as a construction aid in determining the contracting parties' intent (see *Anderson v. Burton Associates, Ltd.* (1991), 218 Ill. App. 3d 261, 267) does not help the dealers, as we have previously found the DSA's to be unambiguous, negating the need for interpretive rules. (*T D C Development Corp. v. First Federal Savings & Loan Association* (1990), 204 Ill. App. 3d 170, 175.) Further, "contract terms implied in law cannot supplant express contract terms." *Foster Enterprises*, 97 Ill. App. 3d at 31.

### BREACH OF CONTRACT—RENT

In count III of their complaint, the dealers allege that, since 1982, Amoco promised and represented to them that the rents it set in its leases would be based on the fair-market/investment value of the land and improvements at the leased facilities. Subsequently, the dealers allege, Amoco failed to disclose information regarding the components of its rental charges; charged the dealers for capital improvements that had never existed at the property, had been removed, had been fully depreciated, were owned by the dealers, or were charged for under separate agreements; charged the dealers for signs which were supposed to be loaned free of charge; imposed duplicate charges for service bays and car washes; and required the dealers to pay for items such as property taxes and maintenance fees which were never incurred or were already reflected in other charges. The dealers claim their rental overpayments, with interest, as damages.

■ Amoco responds that the express language of the leases executed by the dealers contradicts the dealers' claims. We agree.

The form leases executed by the dealers simply state an amount that a dealer must pay to Amoco as rent for its facility. The lease does not state the basis on which the rental charge is determined or what components are included in the rent. The clause following the rental clause states:

> "In the event that the original term of this Lease is for more than one year, each year of said term Lessor reserves the right

to modify the monthly rental specified above to conform with Lessor's established policy rental in effect for this type of facility as of each anniversary date of the commencement of the term by giving Lessee at least ninety (90) days' advance written notice of such changed rental, and Lessee shall have the right at any time during said ninety (90) day period to terminate this Lease upon giving Lessor fifteen (15) days' notice in writing."

Towards the end of the lease, there is an integration clause which states as follows:

"This Lease cancels and supersedes all prior written and unwritten agreements and understandings between the parties pertaining to the matters covered in this Lease. No obligations, agreement [sic] or understandings shall be implied from any of the terms and provisions of this Lease, all obligations, agreements and understandings with respect to the subject matter hereof being expressly set forth herein. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this Lease. No modification or waiver of, addition to, or deletion from the terms of this Lease shall be effective unless reduced to writing and signed by Lessee and a representative of Lessor authorized to execute this Lease."

The dealers do not bring to our attention any documents in which Amoco made any of the representations that the dealers rely upon in bringing this count. Neither do the dealers state whether the representations were written or oral. An examination of the quoted portions of the lease shows that the dealers' allegations are directly inconsistent with the language of the leases. Moreover, the lease language is not ambiguous, and the dealers do not argue that it is.

As we previously stated, an unambiguous contract must be enforced as it is written. (*J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.* (1990), 194 Ill. App. 3d 744, 748.) "Furthermore, a court may not add provisions to an unambiguous contract even if these make the contract more equitable." *Beals*, 194 Ill. App. 3d at 748.

Under the leases here, the dealers clearly agreed to pay Amoco a specified rental charge for their dealer facilities. They also allowed Amoco to modify the rent in future years under certain circumstances. Now, the dealers seek to read more terms into the leases in order to relieve themselves of the burden of what they apparently perceive to be bad bargains. This the law does not allow them to do.

See *National Tea Co. v. American National Bank & Trust Co.* (1981), 100 Ill. App. 3d 1046, 1049.

Nor have the dealers adequately pleaded that the leases are adhesion contracts. The leases are very similar to the DSA's in that the dealers agreed to pay a price set by Amoco that Amoco had discretion to change. We previously found that the dealers had not pleaded factual allegations sufficient to show that the DSA's were adhesive, and the same reasoning applies to the dealers' leases. Moreover, even if the leases were contracts of adhesion, such a conclusion would not necessarily lead to a determination that the leases' integration clauses were invalid, as the dealers argue. Again, as previously stated, we believe that the fact that a contract is one of adhesion does not invalidate a contract, but is one factor to consider when construing ambiguous terms. (See *Methodist Medical Center v. Taylor* (1986), 140 Ill. App. 3d 713, 719.) The leases are not ambiguous.

The dealers seek to have undocumented assertions and promises vary the terms of an unambiguous contract requiring any amendments to be made in writing and specifically disavowing that any outside representations were relied upon in its execution. This is contrary to Illinois law. See *Continental Mobile Telephone Co. v. Chicago S M S A Ltd. Partnership* (1992), 225 Ill. App. 3d 317, 323.

IMPLIED COVENANT—RENT

■ Finally, the dealers allege that Amoco breached the implied covenant of good faith and fair dealing in the leases when it demanded the improper charges detailed in the preceding section. Amoco again asserts that the implied covenant gives rise to no independent cause of action, but rather is only a rule of construction which has no application to the unambiguous leases at issue.

As noted, a covenant to deal fairly and in good faith is implied in every contract in Illinois. (*Vincent v. Doebert* (1989), 183 Ill. App. 3d 1081, 1090.) Under this covenant, a party vested with discretion under the contract may not exercise that discretion arbitrarily or capriciously. *Vincent*, 183 Ill. App. 3d at 1090; *Continental Mobile Telephone Co.*, 225 Ill. App. 3d at 324.

The dealers' leases with Amoco are substantially similar to the DSA's at issue in the gasoline pricing claims, in that the dealers will unavoidably be injured in some way any time that Amoco raises the rent it has contractual discretion to modify. Thus, as with the implied covenant claim under the DSA's, the dealers must sufficiently allege bad faith or unfairness on the part of Amoco in order to show a

breach of the implied covenant of good faith and fair dealing as it pertains to rental charges.

The dealers have not pleaded that the rental charges caused financial trouble for their facilities or even alleged the size of the profit loss for which the overcharges were purportedly responsible. Neither have the dealers alleged that Amoco's rental policies were out of step with those of other oil companies or comparable business concerns.

While we would agree that a plan by Amoco to profit at the dealers' expense by double charging for fixtures or services would point to bad faith by Amoco, the dealers offer no documents or factual allegations substantiating their overcharge claims. Moreover, the dealers' assertions that Amoco represented to them the basis on which it calculated rent or the individual charges for various fixtures are directly contradicted by the leases the dealers signed. Finally, it is not even clear whether the dealers are complaining of the initial rental rates, which Amoco set and which the dealers agreed to pay in the contract, or whether the dealers feel cheated by subsequent modifications to the rent, which were within Amoco's discretion. In short, the dealers seem to be alleging that an additional, contractual rent agreement exists between them and Amoco, separate from the leases specifically embodying the parties' entire agreement. As we discussed, the dealers' breach of contract claim is foreclosed and we do not think that conclusory allegations of unfair dealing, without more, can provide the dealers with a remedy under the circumstances of this case. See *Anderson v. Burton Associates, Ltd.* (1991), 218 Ill. App. 3d 261, 267.

For the reasons outlined in our discussion of the implied covenant as it pertained to gasoline pricing, the dealers have failed to sufficiently allege a breach of the implied covenant of good faith and fair dealing with regard to rental charges.

The judgment of the circuit court of Du Page County dismissing the dealers' complaint with prejudice is affirmed.

Affirmed.

UNVERZAGT and WOODWARD, JJ., concur.