NO. 4-96-0837 

                          IN THE APPELLATE COURT

                                OF ILLINOIS

                              FOURTH DISTRICT

RE/MAX R.E. PROFESSIONALS, INC.,        )    Appeal from

an Illinois Corporation,                )    Circuit Court of

          Plaintiff-Appellee,           )    Champaign County

          v.                            )    No. 91L296

GARY R. ARMSTRONG and JANE              )    

ARMSTRONG,                              )    Honorable

          Defendants-Appellants.        )    Thomas J. Difanis,

                                        )    Judge Presiding.

_________________________________________________________________

          PRESIDING JUSTICE STEIGMANN delivered the opinion of

the court:

          In March 1991, plaintiff, RE/MAX R.E. Professionals,

Inc. (RE/MAX), filed a two-count complaint against defendants,

Gary R. Armstrong and Jane Armstrong, alleging that it was

entitled to recover a real estate commission under the terms of a

listing agreement and a withdrawal agreement.  In January 1995,

RE/MAX filed a motion for summary judgment as to count I (breach

of contract), and in March 1995, the trial court granted RE/MAX's

motion.  The Armstrongs appeal, arguing that (1) the docket entry

did not constitute an entry of judgment; and (2) the court erred

by granting RE/MAX's motion for summary judgment.  We reverse and

remand.       

                               I. BACKGROUND

          The following facts appear from the complaint, deposi-

tions, affidavits, and attached documents.  On July 25, 1990,

RE/MAX and the Armstrongs signed a "RESIDENTIAL LISTING AGREE-

MENT" (listing agreement) granting RE/MAX the exclusive right to

sell real estate owned by the Armstrongs.  The listing agreement

provided, in relevant part, as follows:

               "If, during the term of this agreement,

          anyone, including myself [(the Armstrongs)],

          produces a purchaser, ready, willing and able

          to purchase said property *** I agree to pay

          you a commission of *5% -- FIVE PERCENT. 

          Said commission shall be paid on closing the

          sale herein contemplated or upon failure by

          the purchaser or me to perform under the

          contract of sale.  ***

               The term 'sale' as used herein shall be

          construed to include any exchange to which I

          consent in writing."  (Emphasis added.) 

          On August 8, 1990, Gary telephoned RE/MAX and informed

one of its brokers that the Armstrongs were no longer interested

in selling their property.  On August 10, 1990, Gary signed a

"UNIFORM LISTING WITHDRAWAL AGREEMENT" (withdrawal agreement). 

The withdrawal agreement became effective on August 13, 1990, and

provided, in relevant part, as follows:

               "(2) Should said property be sold or

          exchanged within 90 days from the effective

          date hereof, through any source, to any per-

          son or organization, I agree to pay you a

          commission in the amount provided in the

          listing agreement.

               *** 

               (4) This withdrawal agreement does not

          invalidate any part of the original listing

          agreement except with respect to the enact-

          ment of this withdrawal agreement exactly as

          stated on this form."   (Emphasis added.)

          During mid-August 1990, the Armstrongs showed their

property to the ultimate buyers, Charles Miller and Jacqueline

Cardinale (the buyers).  Shortly thereafter, the buyers visited

the Armstrong property again, and the Armstrongs quoted them a

price of approximately $100,000.  The Armstrongs then went on

vacation and arrived back home in late September 1990.  A few

days later, the buyers looked at the property for the third time. 

A week or so later, the buyers made a counteroffer, and the

Armstrongs accepted it.  Although the Armstrongs and the buyers

reached a verbal agreement on all of the terms of the sale, they

never entered into a written sales contract for the subject

property.  On November 13, 1990, they closed the sale of the

subject property.

          In March 1991, RE/MAX filed a complaint against the

Armstrongs to recover a real estate commission under the terms of

the listing and withdrawal agreements.  In January 1995, RE/MAX

filed a motion for summary judgment as to count I, and the trial

court subsequently granted the motion.  In September 1996, RE/MAX

moved for a voluntary dismissal of count II (fraud) and a final

and appealable judgment as to count I, which the court granted.  

                               II. ANALYSIS

                           A. Entry of Judgment

          The Armstrongs first argue that the docket entry in

this case does not constitute an entry of judgment.  The

Armstrongs specifically contend that when a plaintiff seeks money

damages only, the judgment "must state the amount of money the

judgment calls for."  

          The Armstrongs have waived their contention regarding

an alleged deficiency in the judgment by failing to cite any

relevant authority in support of their claim as required by

Supreme Court Rule 341(e)(7).  See 155 Ill. 2d R. 341(e)(7);

People v. $1,124,905.00 United States Currency, 269 Ill. App. 3d

952, 956, 647 N.E.2d 1028, 1031 (1995).  In this portion of their

brief, the Armstrongs cite only one case; yet that case has

nothing to do with the argument they make.   

                  B. The Trial Court's Grant of RE/MAX's 

                       Motion for Summary Judgment 

 

          The Armstrongs argue that the trial court erred by

granting RE/MAX's motion for summary judgment.  The Armstrongs

specifically contend that their property was "sold" on November

13, 1990, the closing date (which occurred after the 90-day

period set forth in the withdrawal agreement).  Although we dis-

agree with that contention, we nonetheless conclude that the

trial court erred by granting RE/MAX's motion for summary judg-

ment.

          Summary judgment is proper when (1) the resolution of a

case hinges on a question of law, and (2) the moving party's

right to judgment is clear and free from doubt.  Truman L. Flatt

& Sons Co. v. Schupf, 271 Ill. App. 3d 983, 986, 649 N.E.2d 990,

993 (1995).  In considering a motion for summary judgment, the

trial court must consider the affidavits, depositions, pleadings,

and exhibits on file and has a duty to construe the evidence

strictly against the movant and liberally in favor of the nonmov-

ing party.  In re Estate of Hoover, 155 Ill. 2d 402, 410-11, 615

N.E.2d 736, 739-40 (1993).  The trial court will grant the motion

if it finds no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law.  Watkins

v. Schmitt, 172 Ill. 2d 193, 203, 665 N.E.2d 1379, 1385 (1996);

735 ILCS 5/2-1005(c) (West 1994).  

          A reviewing court's role is to consider anew the facts

and law relating to the case and determine whether the trial

court was correct in finding that no genuine issue of material

fact exists, and if none exists, whether the court correctly

entered the judgment as a matter of law.  Kellner v. Bartman, 250

Ill. App. 3d 1030, 1033, 620 N.E.2d 607, 609 (1993).  

          The rights and obligations of a real estate broker are

determined by the terms of the listing or other brokerage agree-

ment.  Bennett & Kahnweiler, Inc. v. American National Bank &

Trust Co., 235 Ill. App. 3d 896, 905, 601 N.E.2d 810, 816 (1992). 

Where the agreement terms are unambiguous, the parties' intent

must be determined solely from the language of the agreement.  

Bennett, 235 Ill. App. 3d at 905, 601 N.E.2d at 816.  The inter-

pretation of an unambiguous written contract is a question of

law.  Kellner, 250 Ill. App. 3d at 1033, 620 N.E.2d at 609. 

Likewise, the determination of whether an ambiguity exists is

also a question of law.  Kellner, 250 Ill. App. 3d at 1033, 620

N.E.2d at 609.     

          In this case, the facts are not controverted; instead,

the parties disagree about the legal effect of the contract terms

and the actions of the Armstrongs and the buyers.  Thus, the

question before us is whether the trial court erred by granting

RE/MAX's motion for summary judgment as a matter of law based on

those facts.

          The terms of the listing agreement and the withdrawal

agreement are unambiguous.  The withdrawal agreement clearly

provides that it does not invalidate any part of the listing

agreement except with respect to those provisions "exactly as

stated" in the withdrawal agreement.  Thus, whenever the with-

drawal agreement and the listing agreement disagree regarding any

provision explicitly stated in the withdrawal agreement, the

withdrawal agreement prevails.  This record shows such a dis-

agreement existed.  The withdrawal agreement invalidates that

portion of the listing agreement that provides that the

Armstrongs owed RE/MAX a commission if a "ready, willing and

able" purchaser was produced during the term of the listing

agreement or if, within 180 days after the expiration of the

term, "a sale is made to any person to whom the property was

shown, by anyone, including [the Armstrongs] during said term." 

Instead, the withdrawal agreement explicitly provides that the

Armstrongs owed RE/MAX a commission if the subject property was

"sold or exchanged within 90 days from the [August 13, 1990,]

effective date [of the withdrawal agreement]."  (Emphasis added.)

          In addition, the remaining valid portions of the

listing agreement unquestionably provide that a "sale" does not

encompass a verbal agreement to sell real estate.  The listing

agreement states that "[t]he term 'sale' as used herein shall be

construed to include any exchange to which [the Armstrongs]

consent in writing."  (Emphasis added.)  Therefore, the terms of

the listing and withdrawal agreements provide that RE/MAX was

entitled to a commission only if the Armstrongs entered into a

written contract for the sale (or other exchange) of their

property during the term of the withdrawal agreement.

          It is uncontroverted that, although the Armstrongs and

the buyers reached a verbal agreement as to all the terms of the

sale within the 90-day period set forth in the withdrawal agree-

ment, they never entered into a written contract for the sale of

the subject property.  RE/MAX concedes as much in its brief

("There was no written residential sales contract").  

          We conclude that (1) the Armstrong's property was not

"sold" within the 90-day period for purposes of entitling RE/MAX

to a commission, and (2) RE/MAX was not entitled to judgment as a

matter of law.  Accordingly, we hold that the trial court erred

by granting RE/MAX's motion for summary judgment.    

          We note in passing that, on appeal, RE/MAX argues as if

the withdrawal agreement states the following:  "If the property

is sold or exchanged or a verbal or written agreement for the

sale of the property is entered into within 90 days from the

effective date of the withdrawal agreement, the seller agrees to

pay RE/MAX a commission in the amount provided in the listing

agreement."  Clearly, that is not what the terms of the withdraw-

al agreement provide.  If that is what RE/MAX wants the withdraw-

al agreement to provide, then it should write the agreement so

that it states exactly that. 

          In addition, we note that if the terms of the listing

and withdrawal agreements had been ambiguous and required con-

struction, we would construe those terms strictly against RE/MAX

because the agreements are adhesion contracts.  See Abbott v.

Amoco Oil Co., 249 Ill. App. 3d 774, 781, 619 N.E.2d 789, 795

(1993) ("generally, burdensome clauses in adhesion contracts

should be construed against the more powerful party").    

                              III. CONCLUSION

          For the reasons stated, we reverse the trial court's

grant of RE/MAX's motion for summary judgment and remand for

further proceedings consistent with the views expressed herein.

          Reversed and remanded.

          GARMAN, J., concurs.

          COOK, J., specially concurs.

          JUSTICE COOK, specially concurring:

          On July 25, 1990, the Armstrongs executed a listing

agreement purporting to be a bilateral contract that gave RE/MAX

the exclusive right to sell their property.  Two weeks later, on

August 8, the Armstrongs notified RE/MAX they were no longer

interested in selling, and the parties executed a withdrawal

agreement.  A few days later, the Armstrongs showed the property

to the Millers.  The Armstrongs reached a verbal agreement with

the Millers, apparently in October, and on November 13, 1990, two

days after the expiration of an extension period provided for in

the withdrawal agreement, the sale was closed.

          A broker is entitled to a commission if the broker has

an exclusive sale agreement with the owner and the property is

sold by anyone during the life of the agreement.  Wilson v.

Middendorf, 248 Ill. App. 3d 870, 872, 619 N.E.2d 179, 180

(1993).  A broker is also entitled to a commission if the owner

acts in bad faith to cause the sale to occur after the life of

the agreement.  Restatement (Second) of Agency §446, Comment e

(1958); Bear Kaufman Realty, Inc. v. Spec Development, Inc., 268

Ill. App. 3d 898, 902-04, 645 N.E.2d 244, 247-48 (1994).  Al-

though the circumstances here are suspicious, there is no evi-

dence that either RE/MAX or the Armstrongs dealt with the Millers

prior to August 13, the effective date of the withdrawal agree-

ment (the date the listing agreement was terminated).  RE/MAX in

fact dismissed its count II, which had alleged that the

Armstrongs were guilty of fraud or bad faith.

          RE/MAX's sole argument is that it is entitled to a

commission by virtue of the language of the withdrawal agreement,

which provides for a commission "[s]hould said property be sold

or exchanged within 90 days from the effective date hereof,

through any source."  That language is very unusual, because it

seems to make the owner liable for a commission after the listing

agreement has expired, even if the purchaser had absolutely no

connection with the property during the term of the listing

agreement.  Extension agreements such as this are intended to

protect the broker from a defrauding owner who waits until just

after the expiration of the initial listing period before selling

to a purchaser with whom the broker has previously conducted

negotiations.  D. Burke, Real Estate Brokers §2.11, at 2:112 (2d

ed. 1992).  

          Extension agreements are discussed in a number of

Illinois cases.  The agreements in those cases require contact

during the period of the listing agreement.  See, e.g., Tom

Brinkoetter & Co. v. Cresthaven Country Club, Inc., 118 Ill. App.

3d 554, 556, 559-60, 454 N.E.2d 1182, 1183, 1185-86 (1983) (pur-

chaser with whom there were negotiations "during the term of this

exclusive listing" (emphasis omitted)); Pilson v. Roush, 82 Ill.

App. 3d 187, 188, 402 N.E.2d 906, 907 (1980) (person "with whom

you have negotiated"); Kokinis v. Kotrich, 81 Ill. 2d 151, 155,

407 N.E.2d 43, 45 (1980) (purchaser to whom it was submitted or

shown during the term of the agreement); Busch v. Eisin, 96 Ill.

App. 3d 909, 910, 422 N.E.2d 135, 136 (1981) ("to a purchaser to

whom it was offered during the period hereof").   

          The explanation here is apparently found in the origi-

nal listing agreement, which also contained an extension clause,

providing for a commission, "if, within 180 DAYS after the

expiration of said term, a sale is made to any person to whom the

property was shown, by anyone, including myself, during said

term."  The withdrawal agreement indicates that it changes the

listing agreement only "exactly as stated" in the withdrawal

agreement.  The 90-day extension period in the withdrawal agree-

ment should accordingly be read to require that the purchaser be

one "to whom the property was shown" during the term of the

listing agreement.  Any other interpretation of the withdrawal

agreement (e.g., absolute liability intended as a penalty,

absolute liability intended to eliminate broker's need to present

evidence) would raise serious questions of overreaching on the

part of the draftor, RE/MAX.

          In the present case, there is no indication the proper-

ty was shown to the Millers during the term of the listing

agreement (July 25, 1990, to August 13, 1990), by either RE/MAX

or the Armstrongs.  Accordingly, RE/MAX was not entitled to a

commission under the withdrawal agreement, and the trial court

erred in entering summary judgment in its favor.  It was not

improper for the Armstrongs to show the property to new prospects

after August 13.  RE/MAX's exclusive right to sell ended on

August 13, when the listing agreement terminated.  

          The Armstrongs argue that there could be no "sale"

under the withdrawal agreement because there was no closing

during the 90-day extension period.  Different considerations

apply to the term of the listing agreement (July 25, 1990, to

August 13, 1990), and to the term of the extension agreement

(August 13, 1990, to November 11, 1990).  It is generally not

necessary that a sale be closed during the term of a listing

agreement, it is only necessary that the broker produce a pur-

chaser who is ready, willing, and able to purchase the property

on the prescribed terms.  A broker may establish his right to a

commission by a legally binding contract of sale.  Hallmark &

Johnson Properties, Ltd. v. Gadea, 218 Ill. App. 3d 921, 926-27,

578 N.E.2d 1180, 1184 (1991); Busch, 96 Ill. App. 3d at 911-13,

422 N.E.2d at 137-38.  That might not be the case with an exten-

sion agreement like the present one, where the language regarding

the entitlement to commission is so different from the listing

agreement, especially if the extension agreement is read to make

the owner absolutely liable for a commission on any sale.  In my

view, however, it is not necessary to address the Armstrongs'

argument that a closing was required.   

          I disagree with the majority's statement that the

language of the listing agreement requires that a sale be in

writing.  The listing agreement provides that "[t]he term 'sale'

as used herein shall be construed to include any exchange to

which I consent in writing."  The purpose of that language is to

make it clear that an "exchange," which is arguably not a "sale,"

is to be treated as a "sale."  The majority erroneously reads the

word "exchange" broadly, as "any type of transaction," and con-

cludes that any type of transaction that is in writing will

constitute a sale.  Other language in the agreement makes it

clear that an "exchange" is an "exchange of properties," and not

every conceivable transaction.  Even if a sale "included" all

exchanges that were in writing, that would not rule out the

possibility there could be some sales that were not in writing.

          I do agree with the majority that a legally binding

contract for the sale of real estate must be in writing.  740

ILCS 80/2 (West 1994).  If the Armstrongs and the Millers acted

in bad faith to cause the sale to occur after the appropriate

period, however, there would be liability for a commission

although no written contract had been executed.  There is no

liability for a commission in this case because the property was

not shown to the Millers by anyone during the appropriate period,

the term of the listing agreement.  Even if there had been a

written agreement (or for that matter, a closing) during the

extension period, there would be no right to a commission unless

the Millers were persons "to whom the property was shown" during

the term of the listing agreement.